**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ZOOM ELECTRIC, INC., a California
corporation,

        Petitioner,

   v.

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 595, a
labor organization, and DOES
1-20,

        Respondents.

_____/

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 595, a
labor organization,

        Counter-Plaintiff,

   v.

ZOOM ELECTRIC, INC., a California
corporation; VEIKO HORAK,
individually and as the alter-ego
of ZOOM ELECTRIC, a sole
proprietorship; and DOES ONE
through TEN, inclusive,

        Counter-Defendants.

_____/

No. C 11-1699 CW

ORDER DENYING ZOOM
ELECTRIC AND
HORAK'S MOTION TO
DISMISS, Docket
No. 17, DENYING
ZEI'S MOTION TO
VACATE, Docket No.
20, DENYING HORAK
AND ZEI'S MOTION
TO DISMISS, Docket
No. 60, GRANTING
THE UNION'S MOTION
FOR LEAVE TO FILE
A SECOND AMENDED
COUNTER-COMPLAINT,
Docket No. 62, AND
GRANTING THE
UNION'S MOTION TO
CONFIRM AND
ENFORCE AND FOR
PARTIAL SUMMARY
JUDGMENT, Docket
No. 69

     Petitioners and Counter-Defendants Zoom Electric, Inc. (ZEI)
and Vieko Horak seek dismissal of the counter-claims of Respondent
and Counter-claimant International Brotherhood of Electrical
Workers, Local 595 (the Union) and to vacate an arbitration award
against it and in favor of the Union.  The Union opposes these
motions, seeks to confirm and enforce the arbitration award, and
moves for summary judgment on its counter-claim against ZEI and

Horak for failure to make benefit contributions pursuant to 29 U.S.C. §§ 301, 1132 and 1145.  The Union also requests leave to file a second amended counter-complaint.  ZEI and Horak oppose all of the Union's motions.  Having considered the papers filed by the parties and their oral arguments, the Court DENIES ZEI and Horak's motions and GRANTS the Union's motions.

BACKGROUND

The parties do not dispute the material facts, which are set forth below.

ZEI's corporate status was suspended at all times relevant, until it was revived on July 11, 2011.  Horak Decl. ¶ 2, Ex. A; IBEW's First Request for Judicial Notice (1RJN), Docket No. 27, Ex. D.  At all times relevant, Vieko Horak was ZEI's sole owner and its agent for service of process, and his address was the same as ZEI's address.  Id.  Since June 29, 2005, Horak has also been registered to do business under the fictitious business name "Zoom Electric" in the City and County of San Francisco.  1RJN, Ex. E.

The Union is a party to a Project Labor Agreement (PLA), which governs the wages and hours, and terms and conditions of employment, for construction work at the Oakland Unified School District (OUSD).  Maloon Decl. ¶ 3, Ex. A (PLA).  On or about September 8, 2010, Horak signed a Letter of Assent on behalf of ZEI, agreeing to be bound by the terms of the PLA while performing work on OUSD construction projects.  Martin Decl. ¶ 3; Maloon Decl. ¶ 9, Ex. C.  Horak listed ZEI's California contractor license number as C10 857743 on the Letter of Assent.  Maloon Decl. ¶ 9, Ex. C.  This number was not ZEI's but was Horak's individual contractor license number, which was registered for him

2

to do business as "Zoom Electric."  Horak Decl. ¶ 3; 1RJN, Exs. A, B; Maloon Decl. ¶ 19.  More than a year later, on September 12, 2011, ZEI applied for its own contractor license; the State rejected its application on September 19, 2011.  IBEW's Second Request for Judicial Notice (2RJN), Ex. A.

The PLA sets forth certain requirements with which contractors must comply to hire workers for covered projects, including that contractors must hire Union members who are out of work, in a one-to-one ratio with the contractor's own employees; hiring of either must take place through a referral from the Union.  PLA ¶ 8.1.  According to this system, the contractor must first hire a Union worker, then may hire the contractor's own qualified worker through a referral from the Union, then may hire a second Union worker, then a second of the contractor's workers, and so on, until the contractor has a sufficient crew for the job or he has hired ten of his own workers.  Id.  To be referred to the contractor, the contractor's employees must first apply to the Union to work on the project and must meet certain qualifications.  Id.  The PLA excludes from this requirement "a Contractor's executives, managerial employees, engineering employees, supervisors . . .."  Id. ¶ 2.7.

All contractors who are signatories to the PLA are obliged to provide conditions of employment, and wages and benefits at certain specified rates, in accordance with the PLA.  Id. at ¶¶ 9.3-9.4.  Contractors also agree to "pay contributions to the established vacation, pension or other form of deferred compensation plan, apprenticeship, and health benefit funds for each hour worked on the Project" in certain specified amounts.

1   <u>Id.</u> at ¶ 9.1.  The amounts are set forth in Schedule A, which

2 consists of the Alameda County Inside Construction Agreement, and

3 which establishes eight employee benefit trust funds.  <u>Id.</u> at

4 ¶ 9.2; Maloon Decl. ¶ 7, Ex. B.

5     The PLA further provides that it is "the responsibility of

6 the Contractor(s) and Unions to investigate and monitor compliance

7 with the provisions of the agreement" described above.  PLA Art.

8 X.  The PLA specifically states, "Nothing in this agreement shall

9 be construed to interfere with or supersede the usual and

10 customary legal remedies available to the Unions and/or employee

11 benefit Trust Funds to collect delinquent Trust Fund contributions

12 from Contractors on the Project."  <u>Id.</u>

13     The PLA also establishes a "grievance arbitration procedure."

14 <u>See id.</u> at Art. XII.  Under the procedure, if parties are unable

15 to resolve a dispute arising "out of the meaning, interpretation

16 or application of the provisions of this Agreement, including the

17 Schedule A agreements" by meeting and conferring about the dispute

18 (Step 1), they are required to submit the dispute to the Joint

19 Administrative Committee (JAC), which must meet "to confer in an

20 attempt to resolve the grievance" (Step 2).  <u>Id.</u> at ¶¶ 12.1, 12.2.

21 If the dispute is not resolved within the time allowed for

22 resolution by the JAC, either party may refer the dispute to an

23 arbitrator within five days (Step 3).  <u>Id.</u> at ¶ 12.2.  The

24 arbitrator must conduct a hearing on the dispute and give the

25 parties a binding decision within five days after the hearing.

26 <u>Id.</u>  The PLA specifies that the "Arbitrator shall have no

27 authority to change, amend, add to or detract from any of the

28 provisions of the Agreement."  <u>Id.</u>

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

On October 14, 2010, three ZEI employees began electrical work on a fire alarm replacement project at Roosevelt Middle School in the OUSD.[1]  Martin Decl. ¶¶ 2, 4; Maloon Decl. ¶ 11. These included: Horak, owner and Chief Executive Officer of ZEI; Aleh Holdvekht, project manager; and Valentin Penkin, electrical wiring supervisor.  Martin Decl. ¶ 4.

On December 20, 2010, a Union representative, Matt Maloon, visited Roosevelt Middle School and observed Holdvekht and Penkin working without any accompanying Union workers.  Martin Decl. ¶ 4; Maloon Decl. ¶ 11.  The Union subsequently began the grievance procedures contained in the PLA for ZEI's work in October through December 2010.  Martin Decl. ¶¶ 5-6; Maloon Decl. ¶ 12.  The Union's grievance alleged that, during this period, ZEI failed to comply with the PLA's referral process and that ZEI failed to make contributions to the trust funds on behalf of the employees who had worked on the project.  Maloon Decl. ¶ 12, Ex. D.  The Union demanded payment for the wages that should have gone to Union workers and for employee benefit contributions for all hours worked on the project.  Id.

On or about January 24, 2011, ZEI ordered labor from the Union and journeyman electricians Wilberto Cuellar-Arandia and

---

[1] Throughout the events relevant to the Roosevelt Middle School project and subsequent JAC proceedings, Horak used both the names Zoom Electric and Zoom Electric, Inc. indiscriminately. See, e.g., Thomas Decl. ¶ 6, Ex. F (documents created or signed by Horak for the Roosevelt Middle School job listing both Zoom Electric and Zoom Electric, Inc.).  Because the Court finds that Horak would be individually liable for the judgments against either entity, the Court need not resolve which entity took which particular actions.  The Court will use ZEI to refer to both, unless otherwise specified.

United States District Court
For the Northern District of California

1  Douglas R. Lindsey were dispatched to the Roosevelt Middle School

2  fire alarm replacement job.  Maloon Decl. ¶ 14.

3      The JAC held a hearing on January 31, 2011 on the Union's

4  grievance about the October through December 2010 violations and

5  subsequently accepted written briefs from the parties.  Maloon

6  Decl. ¶ 15.  ZEI did not dispute that it had violated the PLA and

7  disputed only the amount of money for which it should be liable.

8  Maloon Decl. ¶ 17, Ex. G.  ZEI argued that its employees were

9  exempt from coverage by the PLA, because they performed managerial

10  work.  Id.  ZEI also contended that the Union was seeking to

11  recover "double benefits" contributions to the trust funds instead

12  of the amount that the trust funds would have received had ZEI

13  complied with the PLA, because the Union sought one award for the

14  benefits contribution and a second award for wages, which also

15  included a benefits contribution.  Id.  Finally, ZEI argued that

16  it should be penalized only for the number of hours that Union

17  workers would have worked had ZEI complied with the referral

18  process.  Id.

19      On or about February 18, 2011, B-side, Inc., the general

20  contractor on the Roosevelt Middle School project, and ZEI

21  submitted to the trust funds reports of hours worked under the PLA

22  in the form of ZEI records for the month of January 2011.  Maloon

23  Decl. ¶ 16, Ex. E.  The reports stated that ZEI owed $1,961.88 in

24  fringe benefit contributions on behalf of Cuellar-Arandia and

25  Lindsey for thirty-two hours of work each.  Id.; Horak Depo., Ex.

26  35.  On or about February 20, 2011, the Union received a timely

27  check from ZEI in the amount of $1,961.88, which the Union

28  forwarded to the trust funds.  Maloon Decl. ¶16, Ex. F; Horak

6

United States District Court
For the Northern District of California

Depo., Ex. 36.  In addition to the thirty-two hours reported,
Cuellar-Arandia and Lindsay each worked eight hours for ZEI during
the month of January, which ZEI did not report and for which ZEI
did not make fringe benefit contributions.  Horak Depo., Ex.
37-38.  ZEI's employee, Penkin, also worked thirty-two hours on
the project in January 2011, which ZEI did not report and for
which ZEI did not make fringe benefit contributions, though
payment of these contributions was required by the PLA.  Id.

The JAC issued a decision on February 22, 2011.  Maloon Decl.
¶ 17, Ex. G.  The JAC stated in relevant part,

> The JAC considered both the position of the UNION and
> the EMPLOYER with regard to the payment of Trust Fund
> benefits on behalf of workers of Zoom Electric, Inc.
> that worked[] hours in violation of the PLA.  The
> EMPLOYER states that the payment of hours represents a
> payment of "double benefits" to the UNION.  In fact,
> after review of Article IX, Wages, Benefits And Working
> Conditions, it is clear to the JAC that the benefit
> payments [do] not go to the benefit of the Union, but
> rather, specifically they go to the benefit of workers
> who are entitled to the accrued benefits of such
> contributions.  For the JAC to not acknowledge that fact
> would contribute to further victimization of those
> workers.
>
> The JAC also considered the position taken by the
> EMPLOYER which would only penalize a violating
> contractor for hours in the proper ratio as required by
> Article VIII, Referral. . . . To accept this premise
> would be to accept a significant flaw with regard to
> enforcement of the PLA.  Employers that violated the PLA
> with regard to proper dispatch would only be held to
> account, as if they had properly dispatched and had not
> violated the PLA.  That would only create an enticement
> to violate the PLA . . .

Id. at 5-6.  The JAC rejected ZEI's argument that some of the
hours worked should have been considered exempt by the PLA as
managerial work, relying on ZEI's certified payroll records which
indicated hours covered by the PLA and which were signed under
penalty of perjury by Horak.  Id. at 6.

The JAC ordered ZEI to pay as follows:

Payment to workers on the IBEW 595 Available for Work list of 1648 hours totaling $116,299.36

Payment on behalf of employees of Zoom Electric, Inc. to the IBEW, 595 Trust Funds totaling $42,963.36 for hours worked in violation of the PLA.

Id.

ZEI continued to employ Union labor until sometime in March 2011. Maloon Decl. ¶ 18. Neither ZEI nor B-side, Inc. reported hours worked by these individuals to the trust funds or paid the fringe benefit contributions owed on account of the hours worked. Id. During February 2011, Cuellar-Arnadia and Lindsey worked sixteen hours each and Penkin worked thirty-two hours. Horak Depo., Exs. 37-38.

On April 6, 2011, ZEI filed the instant action seeking to vacate the JAC award, and subsequently amended its pleadings on April 29, 2011. Docket Nos. 1, 11.

On May 6, 2011, the Union answered ZEI's amended pleading and filed a counter-complaint for confirmation and enforcement of the JAC award against both ZEI and Horak. Docket Nos. 15, 16.

On June 27, 2011, Horak and Zoom Electric, as a sole proprietorship, filed a motion pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6) to dismiss the Union's counter-claims. Docket No. 17. On June 29, 2011, ZEI filed a motion to vacate the JAC award, seeking an order that the parties proceed to Step 3 of the PLA's grievance arbitration procedure. Docket No. 20.

On October 20, 2011, the Court granted the Union's motion for leave to file a first amended counter-complaint, adding a cause of action against ZEI and Horak alleging that they had failed to make

United States District Court
For the Northern District of California

benefit contributions for work performed under the PLA for January through March 2011.  Docket No. 54.

On November 8, 2011, ZEI and Horak filed a motion to dismiss the Union's cause of action related to January through March 2011, arguing that the Union had failed to exhaust administrative remedies in relation to that charge.  Docket No. 60.  On that same day, the Court set a briefing and hearing schedule as to the previously filed dispositive motions.  Docket No. 62.

On November 30, 2011, the Union filed a motion for leave to file a second amended counter-complaint.  Docket No. 62.  The Union seeks to add B-Side, Inc. as a Counter-Defendant, to hold it liable for both claims as the general contractor to subcontractor ZEI pursuant to California Labor Code § 2750.5.  The Union also seeks to add as Counter-Plaintiffs the trust funds themselves, Alameda County Electrical Industry Service Corporation (EISC), which serves as the collection agent for the trust funds, and Victor Uno and Don Campbell, who serve as trustees for the trust funds and officers of EISC.

On December 8, 2011, the Union filed a consolidated opposition to ZEI and Horak's pending motions, a cross-motion for confirmation and enforcement of the JAC award and a motion for summary judgment against ZEI and Horak on its counter-claim related to benefit contributions in January and February 2011. Docket No. 69.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

DISCUSSION

I.   Cross-motions to vacate or to confirm and enforce the arbitration award against ZEI

In its consolidated opposition to the Union's motion to confirm and enforce and its reply to the Union's opposition to the motion to vacate (Consolidated Opposition and Reply), ZEI clarifies that it seeks to vacate the JAC award only in part.  In its original motion to vacate, ZEI argued that the JAC exceeded its arbitration powers by finding that its employees were not exempt under PLA ¶ 2.7 and awarding the Union compensation for the wages of all three of its employees, instead of merely for the two Union workers it would have been required to hire had it complied with the PLA hiring and dispatch requirements.  <u>See</u> Mot. to Vacate, at 9.  However, in the Consolidated Opposition and Reply, ZEI concedes that "courts are not permitted to review the merits of these types of findings in labor arbitration awards" and states that it is only challenging as punitive the JAC's award of $42,963.36 in fringe benefits contributions.  Consolidated Opposition and Reply, at 1, 5.

ZEI's argument for vacating the $42,963.36 award for trust fund contributions is that the award is punitive when considered in combination with the $116,299.36 award; ZEI, however, changes its reasoning as to why a punitive award should be vacated.  In its Motion to Vacate, ZEI argues that a punitive award does not "draw its essence" from the PLA, because punitive damages are not specifically authorized by the PLA.  Mot. to Vacate, at 8-11.  In the Consolidated Opposition and Reply, ZEI argues that punitive

damages in a labor arbitration award violate public policy. Consolidated Opposition and Reply, at 4-12.

"In general, courts reviewing the decision of a labor arbitrator are required to accord an arbitrator's decision a 'nearly unparalleled degree of deference.'" SSA Terminals v. Machinists Auto. Trades Dist. Lodge No. 190, 244 F. Supp. 2d 1031, 1033 (N.D. Cal. 2003) (quoting Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173, Int'l Ass'n of Machinists & Aerospace Workers, 886 F.2d 1200, 1205 (9th Cir. 1989)).[2] "When reviewing the award of an arbitrator chosen by the parties to a collective bargaining agreement, we are bound--under all except the most limited circumstances--to defer to the decision of another even if we believe that the decision finds the facts and states the law erroneously." Stead Motors, 886 F.2d at 1204.

"The reason for this unusually high degree of deference is that the arbitrator's decision is deemed to be part of the parties' agreement." SSA Terminals, 244 F. Supp. 2d at 1033. As the Ninth Circuit explained in Stead Motors,

> Unlike the commercial contract, which is designed to be a comprehensive distillation of the parties' bargain, the collective bargaining agreement is a skeletal, interstitial document. The labor arbitrator is the person the parties designate to fill in the gaps; for the vast array of circumstances they have not considered or reduced to writing, the arbitrator will state the parties' bargain. . . .
>
> Since the labor arbitrator is designed to function in essence as the parties' surrogate, he cannot "misinterpret" a collective bargaining agreement.

---

[2] The Union asserts that review of the decision of the JAC is governed by the same standards as those for an arbitrator's award. See Opp. to Mot. to Vacate and Dismiss and Cross-Mot. for Summ. J. 7 n.8. ZEI does not dispute this.

United States District Court
For the Northern District of California

1
2
3

. . . Thus, what courts do when they review an arbitrator's award is more akin to the review of a contract than of the decision of an inferior tribunal: the award, just as a contract, is the expression of the parties' will and must be enforced as expressed unless illegal or otherwise void.

4    Stead Motors, 886 F.2d at 1205-06 (citations omitted).

5        The Ninth Circuit has "identified narrow exceptions to [the]

6    general rule" that labor arbitration awards are entitled to great

7    deference, and has held that "[v]acatur of an arbitration award

8    under section 301 of the LMRA is warranted: (1) when the award

9    does not draw its essence from the collective bargaining agreement

10   and the arbitrator is dispensing his own brand of industrial

11   justice; (2) where the arbitrator exceeds the boundaries of the

12   issues submitted to him; (3) when the award is contrary to public

13   policy; or (4) when the award is procured by fraud."  S. Cal. Gas

14   Co. v. Util. Workers Union, Local 132, 265 F.3d 787, 792-793 (9th

15   Cir. 2001) (internal citations omitted).  The Ninth Circuit has

16   clearly stated that both the "draw its essence" and the "public

17   policy" exceptions are extremely narrow.  See Stead Motors, 886

18   F.2d at 1208 n.8 (stating that for both exceptions, "judicial

19   scrutiny of an arbitrator's decision is extremely limited").

20       Under the "draws its essence" exception,

21
22
23
24
25

[t]he arbitrator's factual determinations and legal conclusions generally receive deferential review as long as they derive their essence from the [collective bargaining agreement].  If, on its face, the award represents a plausible interpretation of the contract, judicial inquiry ceases and the award must be enforced. This remains so even if the basis for the arbitrator's decision is ambiguous and notwithstanding the erroneousness of any factual findings or legal conclusions.

26
27
28

Sheet Metal Workers Int'l Ass'n, Local No. 359 v. Arizona Mech. & Stainless, Inc., 863 F.2d 647, 653 (9th Cir. 1988) (citations omitted).

Similarly, to "vacate an arbitration award on public policy grounds, a court must find: (1) that an 'explicit, well-defined and dominant' public policy exists, and (2) 'that the policy is one that specifically militates against the relief ordered by the arbitrator.'" SSA Terminals, 244 F. Supp. 2d at 1035 (quoting Stead Motors, 886 F.2d at 1212-1213). Such a public policy must "be ascertained by reference to the laws and legal precedence and not from general considerations of supposed public interests." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 43 (1987) (internal quotation marks omitted).

Under either exception, ZEI's argument fails. First, the award was compensatory in nature, not punitive, and drew its essence from the PLA itself. ZEI argues that the JAC's award constitutes "unjust enrichment of $42,936.36," because it "included two separate fringe contributions for the very same work hours." Consolidated Opposition and Reply, at 1. ZEI arrives at this result by reasoning that, because the $116,299.36 award to workers included fringe benefit contributions, a separate fringe benefits award was redundant. See Mot. to Vacate, 10-11. However, as the Union points out, the JAC considered this argument and explicitly made each award to remedy different wrongs that affected distinct groups of individuals. Maloon Decl. ¶ 17, Ex. G, at 5-6.

The JAC awarded $116,299.36 to "workers on the IBEW 595 Available for Work list" for hours that they should have been

13

working but were not because of ZEI's failure to abide by the
PLA's referral provisions.  Id.  The $116,299.36 award included
wages and fringe benefit contributions for these "Available for
Work list" workers for these lost work hours.  Id.; see also
Counter-compl. ¶ 20; Answer to Counter-compl. ¶ 20.

The JAC made the $42,963.36 award "on behalf of employees of
Zoom Electric, Inc. to the IBEW, 595 Trust Funds" for the hours
that these ZEI employees did in fact work and for which they were
entitled to have a fringe benefits contribution made on their
behalf to the trust funds.  Maloon Decl. ¶ 17, Ex. G, at 5-6.
This award remedied ZEI's failure to comply with the benefits
provisions for those workers it did actually employ.  Id.

It is true that ZEI would have only had to make fringe
benefit contributions once, had it complied with the PLA.  But
because its failure to do so implicated the benefits of two
separate sets of workers, the JAC determined that ZEI had to make
amends to both groups in order fully to remedy its improper
conduct.  As the JAC aptly stated, "For the JAC to not acknowledge
that fact would be to contribute to the further victimization of
those workers."  Maloon Decl. ¶ 17, Ex. G, at 6.

Thus, each of these awards was compensatory in nature and
drew its essence from the PLA.  While ZEI argues that the JAC's
use of the word "penalize" means that the awards were punitive,
ZEI misstates the JAC's decision.  The JAC did not use this word
when discussing the purportedly duplicative fringe benefit award,
as ZEI represents.  Instead, the JAC used this word in addressing
ZEI's argument that ZEI should only be required to pay damages for
the two Union workers that it would have had to hire under the

United States District Court
For the Northern District of California

14

dispatch ratio had it complied with the PLA.  As previously stated, ZEI does not dispute in its reply that it should have to pay wages for all three workers.  Further, there is no evidence that the JAC's decision that ZEI should be required to pay the wages of three workers, instead of two, was punitive instead of compensatory.  ZEI did not comply with the requirements of the PLA that would have allowed it to request that the Union dispatch its own workers, and its employees did not apply to the Union to be dispatched; thus, had ZEI utilized Union labor as required under the PLA, the Union would have dispatched three workers from its list of Union members available for work.

Further, even if the JAC's award were punitive, ZEI has not established that such an award should be vacated as contrary to public policy.  ZEI concedes that, in the Ninth Circuit, if a collective bargaining agreement is sufficiently broad to include, even arguably, the power to award punitive damages, a court must defer to the arbitrator's self-interpreted authority to assess such damages.  Consolidated Opposition and Reply, at 12 (citing Goss Golden West Sheet Metal, Inc. v. Sheet Metal Workers Int'l Union, Local 104, 933 F.2d 759, 764 (9th Cir. 1991)).  ZEI also recognizes that the PLA broadly directs the JAC "to resolve the grievance."  PLA ¶ 12.2.  ZEI, however, argues that the PLA expressly limits the remedies available to "only 'normal contract remedies' when recovering delinquent trust fund benefits." Consolidated Opposition and Reply, at 10.

The PLA, however, contains no such restriction.  ZEI cites to Article X, which does not limit the remedies available to the Union but instead expressly states that the PLA does not interfere

United States District Court
For the Northern District of California

with the other remedies or rights that it may have.  See PLA Art. X ("Nothing in this agreement shall be construed to interfere with or supersede the usual and customary legal remedies available to the Unions and/or employee benefit Trust Funds to collect delinquent Trust Fund contributions from Contractors on the Project.").  While it is true that the PLA refers to "normal contract remedies," it does not do so to limit the remedies available here, as ZEI purports.  In section 3.7, the PLA states, "It is agreed . . . with respect to contractors delinquent in trust or benefit contribution payments, that nothing in this Agreement shall affect normal contract remedies available under the local collective bargaining agreements against general contractors or upper-tier subcontractors signatory to those agreements for recovery of subcontractor delinquencies."  By its terms, this section refers to the remedies available when bringing actions against general contractors or higher-level subcontractors for delinquencies of their subcontractors, and is inapplicable to the claims against ZEI here.  Further, it does not limit remedies available in those situations to those expressly stated, but instead provides that the PLA does not interfere those remedies.  ZEI's citation to section 3.4 of the PLA, which states, "No practice, custom, understanding or agreement between a Contractor and a Union party that is not specifically set forth in this Agreement or in its appended Schedule A Agreements will be binding on any other party unless agreed to in writing by the Parties," is also unavailing.  The Union does not seek to enforce any extra-contractual agreement, but rather to enforce a JAC award issued through the grievance process set forth in the PLA.  Thus,

because the PLA broadly grants the JAC the power "to resolve the grievance" without a limitation on the remedies that it may award, this Court cannot hold that the broad grant of power to the JAC did not "even arguably include the power to make an award of punitive damages." Goss, 933 F.2d at 764.

ZEI has not demonstrated that this Court should depart from the great deference normally accorded to labor arbitration awards. Accordingly, the Court DENIES ZEI's motion to vacate the arbitration award and GRANTS the Union's motion to confirm and enforce the award against ZEI.

II.  ZEI and Horak's motion to dismiss, and the Union's motion for summary judgment on, the Union's second cause of action against ZEI and Horak

The Union seeks summary judgment in its favor on the second cause of action in its amended counter-complaint against ZEI for failure to make fringe benefit contributions in January and February 2011.  The Union also seeks to hold Horak responsible as the alter-ego of ZEI.  ZEI and Horak do not dispute the Union's factual allegations or supporting evidence; instead, they move to dismiss the claim and argue that the Union failed to exhaust the administrative remedies mandated by the arbitration clause as required by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq., prior to bringing suit.

ZEI and Horak's arguments fail for several reasons.  First, as quoted above in Article X, the PLA expressly reserves to the Union the right to bring statutory actions to recover delinquent fringe benefit contributions and states that nothing in the PLA shall interfere with its right to do so.  See Trs. of the S. Cal. Pipe Trades Health & Welfare Trust Fund v. Temecula Mech., Inc.,

438 F. Supp. 2d 1156, 1172-1173 (C.D. Cal. 2006) (finding that exhaustion of administrative remedies was not required in an ERISA trust fund contributions case when the collective bargaining agreement contained a provision stating that the plaintiffs' rights to bring a court action were not limited or restricted by the procedures therein).  In contrast, the cases upon which ZEI and Horak rely involve agreements that were understood to require arbitration.  See Graphic Commc'ns Union, Dist. Council No. 2 v. GCIU-Emp'r Ret. Ben. Plan, 917 F.2d 1184, 1186 (9th Cir. 1990) ("The Union and the Plan agree that this provision is for mandatory arbitration.") (emphasis in original).

Further, the Union here seeks recovery on behalf of the trust funds, and seeks to add the trust funds as Counter-Plaintiffs, which is unopposed by ZEI and Horak.  Courts have recognized that, "in the absence of an unambiguous expression by the parties to the contrary, pension funds are not required to exhaust collective bargaining agreement arbitration procedures prior to filing an action for collection of delinquent contributions to the pension fund."  Flynn v. Dick Corp., 481 F.3d 824, 833 (D.C. Cir. 2007) (quoting Flynn v. Interior Finishes, Inc., 425 F. Supp. 2d 38, 48 n.11 (D.D.C. 2006)).  See Carpenters Health & Welfare Trust Fund v. Bla-Delco Constr., 8 F.3d 1365, 1369 (9th Cir. 1993) (trust fund not required to arbitrate prior to bringing action to collect contributions where this was not expressly mandated by any agreement to which the fund was a party); see also Schneider Moving & Storage Co. v. Robbins, 466 U.S. 364, 372 (1984) (holding that "the presumption of arbitrability is not a proper rule of construction in determining whether arbitration agreements between

**United States District Court**
For the Northern District of California

the union and the employer apply to disputes between trustees and

employers, even if those disputes raise questions of

interpretation under the collective-bargaining agreements").

Finally, to argue that exhaustion is required here, ZEI and

Horak rely heavily on cases that address an exhaustion requirement

in the context of plan participants or beneficiaries bringing

claims for benefits under the terms of an ERISA plan, rather than

on cases that address a Union or a trust fund seeking delinquent

contributions pursuant to 29 U.S.C. §§ 1132 and 1145.  See, e.g.,

Chappel v. Laboratory Corp. of Am., 232 F.3d 719 (9th Cir. 2000);

Diaz v. United Agric. Employee Welfare Benefit Plan & Trust, 50

F.3d 1478 (9th Cir. 1995); Amato v. Bernard, 618 F.2d 559 (9th

Cir. 1980).  See also Graphic, 917 F.2d at 1187 (summarizing the

holding of Amato, the first case in the Ninth Circuit addressing

exhaustion in the ERISA context, as "federal courts should usually

require that parties seeking a review of a decision by an employee

benefit plan's administrator first seek review of that decision

from the plan's trustees").

ZEI and Horak present no authority to support that this

court-created doctrine has been applied in actions for delinquent

trust fund contributions, and do not argue that the same reasoning

that motivated courts to create the requirement are present here.

In Amato, which involved an ERISA claim for benefits under a union

pension plan, the Ninth Circuit predicated its holding that

exhaustion generally should be required in such cases on specific

findings, including that Congress had included in ERISA a

requirement that plans must "provide administrative remedies for

persons whose claims for benefits have been denied" and authorized

United States District Court
For the Northern District of California

1  the Secretary of Labor to promulgate regulations governing such
2  procedures.  Amato, 618 F.2d at 567.  Congress, however, did not
3  include in ERISA a requirement that plans establish such
4  administrative remedies for the collection of delinquent trust
5  fund contributions; instead, Congress enacted 29 U.S.C. § 1145,
6  which "created a cause of action under ERISA for proceeding
7  against an employer who is delinquent in making contributions to a
8  plan."  Local 159 v. Nor-Cal Plumbing, Inc., 185 F.3d 978, 983
9  (9th Cir. 1999).  See also Trs. of the Screen Actors Guild--
10 Producers Pension & Health Plans v. NYCA, Inc., 572 F.3d 771, 776
11 (9th Cir. 2009)).

12      Further, in Amato, the Ninth Circuit recognized that Congress
13 enacted the statutory requirement that plans provide
14 administrative remedies for benefit claims for a variety of
15 reasons, including "to promote the consistent treatment of claims
16 for benefits; to provide a nonadversarial method of claims
17 settlement; and to minimize the costs of claims settlement for all
18 concerned."  Amato, 618 F.2d at 567.  The Ninth Circuit also
19 acknowledged that ERISA granted the trustees broad fiduciary
20 rights and responsibilities to the plans and that requiring
21 exhaustion of administrative remedies both allowed the trustees to
22 undertake their duties without premature judicial interference in
23 their decision-making process and allowed the courts to benefit
24 from the trustees' prior consideration and evaluation of the
25 claim.  Id. at 567-68.  ZEI and Horak make no showing that such
26 concerns are present in actions which are not claims for benefits
27 and in which the trustees are plaintiffs seeking to enforce
28 statutory obligations of employers.

**United States District Court**
For the Northern District of California

1  Accordingly, the Court finds that the Union was not required

2  to exhaust administrative remedies prior to bringing its second

3  cause of action.  The Court DENIES ZEI and Horak's motion to

4  dismiss this claim and GRANTS the Union's motion for summary

5  judgment in its favor on this claim against ZEI.  Horak's

6  liability as the alter-ego for ZEI is addressed below in Section

7  Three.

8  III. Horak and sole proprietorship Zoom Electric's motion to
       dismiss the Union's counter-claims and the Union's motions to
9      enforce the award against Horak and for summary judgment on
       its second cause of action against Horak

10  Horak and Zoom Electric, as a sole proprietorship, seek to

11  dismiss the Union's counter-claims against them on the bases that

12  they were not signatories to the PLA or parties to the JAC award

13  and that the counter-complaint does not allege sufficient facts to

14  support a finding that Horak was the alter ego of ZEI or Zoom

15  Electric.  The Union in turn seeks to enforce the arbitration

16  award against Horak, and summary judgment against Horak on its

17  second cause of action, by piercing the corporate veil and holding

18  Horak accountable for actions that he took on behalf of Zoom

19  Electric, Inc. while its corporate status was suspended.

20  As the sole owner of Zoom Electric, Horak "is personally

21  liable for all debts and responsibilities incurred by the

22  business." Paradise Northwest, Inc. v. Randhawa, 2012 U.S. Dist.

23  LEXIS 6210, at *9 (E.D. Cal.) (citing Century Sur. Co. v. Polisso,

24  139 Cal. App. 4th 922, 943 (2006)).  See also York Group, Inc. v.

25  Wuxi Taihu Tractor Co., 632 F.3d 399, 403 (7th Cir. 2011) ("A

26  proprietorship is just a name that a real person uses when doing

27  business; it is not a juridical entity. . . .  The only entity is

28

United States District Court
For the Northern District of California

the proprietor . . . [The names of the proprietorship and the proprietor] are two names for the same person."); Asdourian v. Araj, 38 Cal. 3d 276, 284-85 (1985), superseded by statute on other grounds as stated in Pac. Custom Pools, Inc. v. Turner Constr. Co., 79 Cal. App. 4th 1254, 1261 (2000) (in essence, a sole proprietorship is the individual).

The Union has also presented sufficient evidence to pierce the corporate veil of Zoom Electric, Inc. and hold Horak liable for its debts as well. "In considering whether to disregard the corporate form, we apply federal substantive law, although we may look to state law for guidance." Board of Trustees v. Valley Cabinet & Mfg. Co., 877 F.2d 769, 772 (9th Cir. 1989) (citing Laborers Clean-Up Contract Admin. Trust Fund v. Uriarte Clean-Up Serv., 736 F.2d 516, 523 (9th Cir. 1984)). "The determination of whether or not to pierce the corporate veil and hold a shareholder personally liable for corporate debts is based on three factors: 'the amount of respect given to the separate identity of the corporation by its shareholders, the degree of injustice visited on the litigants by recognition of the corporate entity, and the fraudulent intent of the incorporators.'" Id. (quoting Seymour v. Hull & Moreland Eng'g, 605 F.2d 1105, 1111 (9th Cir. 1979)). A party seeking to pierce the corporate veil "must prevail on the first threshold factor and on one of the other two." UA Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1475 (9th Cir. 1995). In addition to the formation of a corporation with fraudulent intent, "post incorporation misuse of the corporate form . . . can satisfy the fraudulent intent element." Valley Cabinet, 877 F.2d at 774.

**United States District Court**
For the Northern District of California

The Union has presented substantial evidence, and Horak does not dispute, that Horak has failed to respect Zoom Electric, Inc.'s corporate form.  First, Horak conducted a significant amount of business in the name of Zoom Electric, Inc. while its corporate status was suspended, including assenting to the PLA, contracting to perform the work at Roosevelt Middle School and participating in the JAC dispute resolution process.  Further, while suspension of corporate status under section 23301 of the California Revenue and Tax Code does not automatically "deprive the corporation's shareholders of the normal protection of limited liability," a "corporation's failure to pay its franchise tax," which is the reason for suspension, is one piece of evidence "that the shareholders do not view the corporation as having a separate existence and that the corporation should possibly be regarded as the alter ego of its shareholders."  United States v. Standard Beauty Supply Stores, Inc., 561 F.2d 774, 776-777 (9th Cir. 1977).  Finally, instead of obtaining a contractor license for Zoom Electric, Inc., as required by California law prior to Zoom Electric, Inc. acting as a contractor, see Cal. Bus. & Prof. Code §§ 7025, 7028, Horak used his own contractor license number as that of Zoom Electric, Inc., which is prohibited by law, Cal. Bus. & Prof. Code § 7027.3.  See also Opp v. St. Paul Fire & Marine Ins. Co., 154 Cal. App. 4th 71, 76-80 (2007) (a corporation may not claim "substantial compliance" with the licensing requirement if it has never been licensed within the state of California, even if its managing officer and sole owner was duly licensed throughout the relevant time period).

**United States District Court**
For the Northern District of California

As previously stated, in addition to showing that Horak failed to respect Zoom Electric, Inc.'s corporate form, the Union must also show either that recognition of the corporate form would result in an injustice or that Horak formed the corporation with fraudulent intent or engaged in post-incorporation misuse of the corporate form.  Instead of proving just one of these additional requirements, the Union has satisfied its burden as to both.

Horak does not raise any disputed material facts in response to the evidence presented by the Union to support the fraudulent intent prong.  The Union has introduced evidence that Horak has continually misrepresented the corporate status of Zoom Electric, Inc. in a variety of settings, including in the letter of assent to the PLA, in the contract with B-side, and to the JAC and other participants in the arbitration process.  Under California law, Horak may be held criminally liable for transacting business on behalf of Zoom Electric, Inc. while its corporate status was suspended.  See Cal. Rev. & Tax Code § 19719(a) (creating a criminal offense for "attempt[ing] or purport[ing] to exercise the powers, rights, and privileges of a corporation that has been suspended pursuant to Section 23301").  Further, the fact that Horak misrepresented and failed to correct mistakes about Zoom Electric, Inc.'s corporate and license status during the JAC process suggests that he did so in order not to be individually named in the JAC award.

"Courts have found [the injustice] prong satisfied when 'a corporation is so undercapitalized that it is unable to meet debts that may reasonably be expected to arise in the normal course of business.'"  Laborers Clean-Up Contract Admin. Trust Fund v.

United States District Court
For the Northern District of California

Uriarte Clean-Up Service, Inc., 736 F.2d 516, 525 (9th Cir. 1984)
(citing Note, Piercing the Corporate Law Veil: The Alter Ego
Doctrine Under Federal Common Law, 95 Harv. L. Rev. 853, 855
(1982)).  The fact that Zoom Electric, Inc. failed to pay its
franchise tax, resulting in suspension of its corporate status, is
evidence that it was undercapitalized.  Horak has also admitted
that Zoom Electric, Inc. lacked the funds to make fringe benefits
contributions for workers whom it employed at least in March 2011.
Horak Depo. 79, 84.  Zoom Electric, Inc. willfully contributed to
its own undercapitalization by undertaking work without a valid
contractor license: it may not bring a suit for payment on jobs
that it undertook while unlicensed and any person who has already
paid Zoom Electric, Inc. for such work may bring an action to
recover that compensation.  See Cal. Bus. & Prof. Code
§ 7031(a),(b).

    Accordingly, the Court GRANTS the Union's motions to confirm
and enforce the arbitration award against Horak and for summary
judgment in its favor on its second cause of action against Horak,
and DENIES Horak and Zoom Electric's motion to dismiss that cause
of action.

IV.  The Union's motion for leave to file a second amended
     counter-complaint

    The Union seeks leave to add B-Side, Inc. as a
Counter-Defendant in order to hold it liable as the general
contractor to subcontractor ZEI pursuant to California Labor Code
section 2750.5.  The Union also seeks to add as Counter-Plaintiffs
the trust funds, EISC, Uno and Campbell.  ZEI opposes the Union's
motion to join B-Side and does not oppose joinder of the

additional Counter-Plaintiffs.  Opp. to Mot. for Leave, Docket No. 65.

ZEI argues that joinder of B-side should not be permitted, because the Union has delayed in seeking leave, resulting in prejudice against ZEI, because joinder of B-side is futile as a matter of law, and because the Union acted in bad faith.

Federal Rule of Civil Procedure 15(a) provides that leave of the court allowing a party to amend its pleading "shall be freely given when justice so requires."  Because "Rule 15 favors a liberal policy towards amendment, the nonmoving party bears the burden of demonstrating why leave to amend should not be granted." Genentech, Inc. v. Abbott Laboratories, 127 F.R.D. 529, 530-531 (N.D. Cal. 1989) (citing Senza-Gel Corp. v. Seiffhart, 803 F.2d 661, 666 (Fed. Cir. 1986)).  Courts generally consider five factors when assessing the propriety of a motion for leave to amend: undue delay, bad faith, futility of amendment, prejudice to the opposing party and whether the party has previously amended the pleadings.  Ahlmeyer v. Nev. Sys. of Higher Educ., 555 F.3d 1051, 1055 n.3 (9th Cir. 2009).

Although these five factors are generally all considered, "futility of amendment alone can justify the denial of a motion." Id. at 1055.  "[A] proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." Miller v. Rykoff-Sexton, 845 F.2d 209, 214 (9th Cir. 1988); Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995).  In contrast, delay is "not alone enough to support denial."  Morongo Band of Mission Indians v. Rose, 893 F.2d 1074, 1079 (9th Cir. 1990).

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   ZEI argues that the Union has unduly delayed in seeking to
2   add B-side, because it has known since before filing the lawsuit
3   that ZEI was unlicensed and was a subcontractor of B-side.  The
4   Union responds only that it could not "conclusively show that ZEI
5   had no contractor license of its own" until Horak was deposed on
6   November 18, 2011.  Reply, at 7.  However, despite the Union's
7   arguments, Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007),
8   and Ashcroft v. Iqbal, 556 U.S. 662 (2009), do not require it to
9   be able "conclusively" to prove its case in order to satisfy the
10  pleading requirements.  The Union admits that it believed that ZEI
11  was unlicensed before the commencement of the case and that it has
12  had evidence since at least July 11, 2011 from the Contractors
13  License Board, showing that ZEI was unlicensed.  Reply, at 7.  See
14  1RJN, Docket No. 27, Exs. A-C.  Accordingly, the Court finds that
15  the Union delayed for at least five to seven months in seeking
16  leave to amend.

17      ZEI also argues that the Union is acting in bad faith by
18  seeking to add B-side to this case only after the Union's
19  stop-notice case against B-side was dismissed in state court.  The
20  Union responds that it could institute a new and separate action
21  against B-side bringing the same claims as in the instant case.
22  ZEI presents no evidence or argument that the stop-notice case
23  would bar the Union from doing so or how that case, a very
24  different type of action, could have determined issues related to
25  B-side's liability for the arbitration award under section 2750.5.
26  Accordingly, the Court finds that ZEI has not established that the
27  Union is acting in bad faith.

28

1    ZEI further argues that amendment would be futile, because

2   the LMRA pre-empts section 2750.5, on which the Union relies to

3   argue that B-side as general contractor is the employer of its

4   unlicensed subcontractor and those employed by its unlicensed

5   subcontractor.  See Hunt Bldg. Corp. v. Bernick, 79 Cal. App. 4th

6   213, 220 (2000) ("Labor Code section 2750.5 operates to

7   conclusively determine that a general contractor is the employer

8   of not only its unlicensed subcontractors but also those employed

9   by the unlicensed subcontractors.") (collecting cases).  ZEI

10  argues that the LMRA "completely preempts" state law claims

11  brought to enforce collective bargaining agreements, such that

12  "any claim purportedly based on that preempted state law is

13  considered, from its inception, a federal claim, and therefore

14  arises under federal law."  Balcorta v. Twentieth Century-Fox Film

15  Corp., 208 F.3d 1102, 1107 (9th Cir. 2000).  ZEI reasons that the

16  Union thus may not rely on the California Labor Code for liability

17  against B-side.  ZEI does not cite any case in which a court has

18  found that the LMRA preempts section 2750.5.

19    The LMRA's broad preemption is not without limits.  The

20  Supreme Court has stated that the LMRA "cannot be read broadly to

21  pre-empt nonnegotiable rights conferred on individual employees as

22  a matter of state law."  Livadas v. Bradshaw, 512 U.S. 107, 123

23  (1994).  Further, "the Supreme Court has distinguished between

24  claims that require interpretation or construction of a labor

25  agreement and those that require a court simply to 'look at' the

26  agreement."  Balcorta, 208 F.3d at 1108 (citing Livadas, 512 U.S.

27  at 123-26); see also Livadas, 512 U.S. at 124 ("when the meaning

28  of contract terms is not the subject of dispute, the bare fact

28

United States District Court
For the Northern District of California

that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished").

The Union argues that section 2750.5 confers a non-negotiable right intended to protect all workers from unlicensed contractors. ZEI appears to counter that this right is limited only to "worker's compensation coverage" for "those injured on a job," because it is located within the workers' compensation statute. Opp. to Mot. for Leave, at 7.  However, it is not located within Divisions 4 through 4.7 of the California Labor Code, which address Workers' Compensation, but instead is located within Division Three, which addresses Employment Relations.  California state courts have explicitly recognized that section 2750.5 is not limited to workers' compensation cases.  See Foss v. Anthony Industries, 139 Cal. App. 3d 794, 798 (1983) ("To uphold the superior court's finding section 2750.5 applies only in workers' compensation cases, we would have to assume the Legislature did not realize the scope of the division in which it placed the new section, an assumption we cannot make."); Sanders Construction Co., Inc. v. Cerda, 175 Cal. App. 4th 430, 436 (2009) ("Although we agree that one reason for section 2750.5 is to insure compensation for injured workers, we also recognize it is fundamental that workers be paid.  We discern no meaningful distinction exists between being paid wages and receiving other benefits based on wages.  In both instances, the same policy reasons militate against allowing a general contractor to escape liability for the obligations of an unlicensed subcontractor.").

29

1    Further, application of section 2750.5 in this case would not

2  require any interpretation of the PLA, because once ZEI's

3  liability is established, as it has been, the PLA does not need to

4  be consulted to determine B-side's liability as general contractor

5  under section 2750.5.

6    ZEI also suggests that B-side may not be held liable because

7  ZEI told B-side that it was licensed, and because B-side did not

8  have an opportunity to defend itself during the JAC proceeding, so

9  the JAC award cannot be enforced against it.  These are defenses

10  that can be raised and argued by B-side itself.  These matters do

11  not amount to prejudice to ZEI.

12    The Court finds that ZEI has not demonstrated that the Union

13  has not stated a plausible claim to relief under which B-side may

14  be held liable for the award against ZEI under section 2750.5.

15    Finally, ZEI argues that it would be unduly prejudiced by

16  B-side's joinder because it would increase litigation costs.

17  However, with this Order, the Court resolves all claims against

18  ZEI, and only the liability of B-side remains to be adjudicated.

19  Even if additional discovery were required from ZEI, it would be

20  very limited, and would only go to whether ZEI was the

21  sub-contractor of B-side for the relevant jobs and whether ZEI was

22  licensed during the relevant time period.  Consequently, ZEI has

23  not demonstrated that amendment would prejudice it.

24    Accordingly, the Court GRANTS the Union's motion for leave to

25  file a second amended counter-complaint.  The Union shall file the

26  second amended counter-complaint forthwith and serve it as soon as

27  possible.

28

**United States District Court**
For the Northern District of California

CONCLUSION

1

2     For the reasons set forth above, the Court DENIES Horak and

3  Zoom Electric's motion to dismiss (Docket No. 17), DENIES ZEI's

4  motion to vacate the arbitration award (Docket No. 20), DENIES

5  Horak and ZEI's motion to dismiss the Union's first amended

6  counter-complaint (Docket No. 60), GRANTS the Union's motion for

7  leave to file a second amended counter-complaint (Docket No. 62),

8  and GRANTS the Union's motion to confirm the arbitration award and

9  for summary adjudication on its second cause of action (Docket No.

10  69).

11     Within seven days of the date of this Order,

12  Counter-Plaintiffs shall file a verified calculation of the

13  damages that they request based on their second cause of action.

14  Specifically, Counter-Plaintiffs shall include a calculation of

15  the contributions ZEI failed to make for forty-eight hours of

16  labor in January 2011 and sixty-four hours in February, plus

17  liquidated damages equal to ten percent (10%) of delinquent

18  contributions and interest at the rate of twelve percent (12%)

19  simple interest per annum, and shall show how they calculated the

20  total requested damages.

21     The case management conference currently set for March 29,

22  2012 at 2:00 p.m. is CONTINUED to May 9, 2012 at 2:00 p.m.

23     IT IS SO ORDERED.

24

25  Dated: 3/20/2012

                                       CLAUDIA WILKEN

                                       United States District Judge

26

27

28

**United States District Court**
For the Northern District of California