IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

ZOOM ELECTRIC, INC.,

      Petitioner,

  v.

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 595,
and DOES 1-20,

      Respondents.

_____/

INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, LOCAL 595;
ALAMEDA COUNTY ELECTRICAL
INDUSTRY SERVICE CORPORATION;
IBEW LOCAL 595 HEALTH & WELFARE
TRUST FUND; IBEW LOCAL 595
PENSION TRUST FUND; IBEW LOCAL
595 MONEY PURCHASE PENSION TRUST
FUND; IBEW LOCAL 595 VACATION
FUND; IBEW LOCAL 595 APPRENTICE &
TRAINING FUND; ELECTRICAL
CONTRACTORS TRUST; CONTRACT
ADMINISTRATION FUND; LABOR
MANAGEMENT COOPERATION FUND;
VICTOR UNO; and DON CAMPBELL,

      Counter-Plaintiffs,

   v.

ZOOM ELECTRIC, INC.; VEIKO HORAK;
B-SIDE, INC.; and DOES ONE
through TEN, inclusive,

      Counter-Defendants.

_____/

No. C 11-1699 CW

ORDER DENYING
B-SIDE'S MOTION TO
STAY (Docket No.
107), GRANTING
COUNTER-
PLAINTIFFS' MOTION
FOR SUMMARY
JUDGMENT (Docket
No. 108), DENYING
B-SIDE'S CROSS-
MOTION FOR SUMMARY
JUDGMENT (Docket
No. 112) AND
DIRECTING THE
CLERK TO ENTER
PARTIAL JUDGMENT

**United States District Court**
For the Northern District of California

B-SIDE, INC.,

       Cross-Claimant,

   v.

VEIKO HORAK, doing business as
ZOOM ELECTRIC,

       Cross-Defendant.

_____/

    Counter-Defendant B-Side, Inc. moves to stay proceedings pending resolution of a state court action between it and Counter-Plaintiff International Brotherhood of Electrical Workers, Local 595 (the Union).  The Union and the other Counter-Plaintiffs, the employee benefit trust funds, Alameda County Electrical Industry Service Corporation (EISC), which is the collection agent for the trust funds, and Victor Uno and Don Campbell, who are trustees for the trust funds and officers of EISC, oppose the motion to stay and move for summary judgment on their claims against B-Side.  B-Side opposes Counter-Plaintiffs' motion for summary judgment and also moves for summary judgment.

    Having considered the papers filed by the parties and their arguments at the hearing, the Court DENIES B-Side's motion to stay, GRANTS Counter-Plaintiffs' motion for summary judgment and DENIES B-Side's cross-motion for summary judgment.  This resolves all remaining claims in this action, except for those brought by B-Side against Counter-Defendant and Cross-Defendant Vieko Horak.  Because Horak has filed for bankruptcy, the claims against him are stayed pursuant to 11 U.S.C. § 362.  Finding no just reason for delaying the other claims during the stay, the Court directs the Clerk to enter partial judgment on the claims that do not involve

Horak, including Counter-Plaintiffs' claims against B-Side and those resolved in the Court's Order of March 20, 2012, which were the Union's claims against Petitioner and Counter-Defendant Zoom Electric, Inc. (ZEI) and ZEI's claim against the Union.

BACKGROUND

The following facts are taken from the evidence already in the record and that submitted by the parties in connection with the instant motions.

ZEI was first incorporated in 2007.  Request for Judicial Notice (RJN), Docket No. 27, Ex. D.  ZEI's corporate status was suspended at all times relevant to this action, until it was revived on July 11, 2011.  Id.; Horak Decl., Docket No. 50, ¶ 2, Ex. A.  At all times relevant, Vieko Horak was ZEI's sole owner and its agent for service of process, and his address was the same as ZEI's address.  RJN, Docket No. 27, Ex. D. Since June 29, 2005, Horak has also been registered to do business under the fictitious business name "Zoom Electric" in the City and County of San Francisco. RJN, Docket No. 27, Ex. E.

The Union is a party to a Project Labor Agreement (PLA), which governs the wages and hours, and terms and conditions of employment, for construction work at the Oakland Unified School District (OUSD).  See Maloon Decl., Docket No. 43, ¶ 3, Ex. A (PLA).  On or about September 8, 2010, Horak signed a Letter of Assent on behalf of ZEI, agreeing to be bound by the terms of the PLA while performing work on OUSD construction projects.  Maloon Decl., Docket No. 43, ¶ 9, Ex. C; Martin Decl., Docket No. 21, ¶ 3 & Ex. B.  B-Side, Inc. also signed an identical Letter of Assent to the PLA.  Martin Decl., Docket No. 21, ¶ 3 & Ex. B.  On ZEI's

Letter of Assent, Horak listed ZEI's California contractor's license number as C10 857743.  Maloon Decl., Docket No. 43, ¶ 9, Ex. C; Martin Decl., Docket No. 21, ¶ 3 & Ex. B.  This number was not ZEI's but was Horak's individual contractor's license number, which was registered for him to do business under the fictitious name of "Zoom Electric."  Horak Decl., Docket No. 50, ¶ 3; RJN, Docket No. 27, Exs. A-C, E; Maloon Decl., Docket No. 43, ¶ 19. More than a year later, on September 12, 2011, ZEI applied for its own contractor's license; the State rejected its application on September 19, 2011.  RJN, Docket No. 72, Ex. A.

The PLA sets forth certain requirements with which contractors must comply to hire workers for covered projects, including that contractors must hire Union members who are out of work, in a one-to-one ratio with the contractor's own employees; hiring of either must take place through a referral from the Union.  PLA ¶ 8.1.  According to this system, the contractor must first hire a Union worker, then may hire the contractor's own qualified worker through a referral from the Union, then may hire a second Union worker, then a second of the contractor's workers, and so on, until the contractor has a sufficient crew for the job or he has hired ten of his own workers.  Id.  To be referred to the contractor, the contractor's employees must first apply to the Union to work on the project and must meet certain qualifications. Id.  The PLA excludes from this requirement "a Contractor's executives, managerial employees, engineering employees, supervisors . . ."  Id. ¶ 2.7.

All contractors who are signatories to the PLA are obliged to provide conditions of employment, and wages and benefits at

4

United States District Court
For the Northern District of California

certain specified rates, in accordance with the PLA.  Id. at

¶¶ 9.3-9.4.  Contractors also agree to "pay contributions to the

established vacation, pension or other form of deferred

compensation plan, apprenticeship, and health benefit funds for

each hour worked on the Project" in certain specified amounts.

Id. at ¶ 9.1.  The contribution amounts are set forth in Schedule

A, which consists of the Alameda County Inside Construction

Agreement.  Id. at ¶ 9.1; Maloon Decl., Docket No. 43, ¶ 6 & Ex.

B.  This document also establishes eight employee benefit trust

funds, which are among the Counter-Plaintiffs to this action.

Maloon Decl., Docket No. 43, ¶ 7 & Ex. B.  The trust funds are

jointly managed by Union and employer trustees and are governed by

written Trust Agreements.  Id.  Signatories to the PLA agree to be

bound by the written terms of the Trust Agreements.  PLA ¶ 2.

The PLA further provides that it is "the responsibility of

the Contractor(s) and Unions to investigate and monitor compliance

with the provisions of the agreement" described above.  PLA Art.

X.  The PLA specifically states, "Nothing in this agreement shall

be construed to interfere with or supersede the usual and

customary legal remedies available to the Unions and/or employee

benefit Trust Funds to collect delinquent Trust Fund contributions

from Contractors on the Project."  Id.

The PLA also establishes a "grievance arbitration procedure."

See id. at Art. XII.  Under the procedure, if parties are unable

to resolve a dispute arising "out of the meaning, interpretation

or application of the provisions of this Agreement, including the

Schedule A agreements" by meeting and conferring about the dispute

(Step 1), they are required to submit the dispute to the Joint

United States District Court
For the Northern District of California

Administrative Committee (JAC), which must meet "to confer in an attempt to resolve the grievance" (Step 2).  Id. at ¶¶ 12.1, 12.2. If the dispute is not resolved within the time allowed for resolution by the JAC, either party may refer the dispute to an arbitrator within five days (Step 3).  Id. at ¶ 12.2.  The arbitrator must conduct a hearing on the dispute and give the parties a binding decision within five days after the hearing. Id.  The PLA specifies that the "Arbitrator shall have no authority to change, amend, add to or detract from any of the provisions of the Agreement."  Id.

B-Side was awarded a contract for a fire alarm replacement project at Roosevelt Middle School in the OUSD, Project 7099. Kalafati 1st Decl., Docket No. 51, ¶ 1; Kalafati 2nd Decl., Docket No. 112-2, ¶ 3;[1] Hwang Decl., Docket No. 108-1, Ex. A (B-Side's

---

[1] Counter-Plaintiffs object to each paragraph of the declaration of Anton Kalafati, president of B-Side, that was submitted with B-Side's cross-motion on the basis that the statements made therein are hearsay or without foundation.  They also suggest that the Court should give the declaration "no evidentiary weight" because it is "uncorroborated and self-serving."  Counter-Pls.' Opp. to B-Side's Cross-Mot. for Summ. J. and Reply in Supp. of Mot. for Summ. J. 1 n.2, 5 n.6; Separate Evid. Objections, Docket No. 115-2.  In violation of Civil Local Rule 7-3(a),(c), Counter-Plaintiffs have filed their evidentiary objections separately from their brief.  Because their brief and this separate document are together under the page limit, the Court excuses as harmless the violation of the Civil Local Rules.

United States District Court
For the Northern District of California

1   Resp. to Requests for Admission), 3-4.  On August 18, 2010, Horak

2

3       Counter-Plaintiffs make only conclusory objections regarding
    hearsay and foundation, without any explanation of the basis for
4   these objections.  Most of the statements made by Kalafati are
    based on his personal knowledge, including about his own beliefs,
5   and are not hearsay.  Further, to the extent that Counter-
    Plaintiffs contend that the documents attached to his declaration
6   are without foundation, Kalafati has provided a proper foundation
    for them in his declaration.  However, the statement made by
7   Kalafati, that, at the JAC evidentiary hearing, he learned "that
    one of the two arbitrators, Gene Johnson, was an employee of
8   Davillier Sloan, a consulting firm that the OUSD had hired to
    administer the Project Labor Agreement," Kalafati 2nd Decl.,
9   Docket No. 112-2, ¶ 8, is inadmissible as hearsay and without
    foundation.  Kalafati has not attested to how he learned this or
10  how it is a fact within his personal knowledge, and it appears
    that Kalafati is repeating something that was stated at the
11  arbitration.  Thus, the Court sustains the objection to this
    statement and overrules the conclusory objections to the remainder
12  of the declaration.

13      As to Counter-Plaintiffs' suggestion that the declaration
    should not be given any evidentiary weight, the Ninth Circuit
14  recognizes that a court "need not find a genuine issue of fact"
    where a declaration is "self-serving" and contains only "bald,
15  uncorroborated, and conclusory assertions."  FTC v. Neovi, Inc.,
    604 F.3d 1150, 1159 (9th Cir. 2010) (internal quotation marks and
16  citations omitted); see also Hexcel Corp. v. Ineos Polymers, Inc.,
    681 F.3d 1055, 1063 (9th Cir. 2012) ("Conclusory, self-serving
17  affidavits, lacking detailed facts and any supporting evidence,
    are insufficient to create a genuine issue of material fact.")
18  (internal quotation marks, brackets and citation omitted).
    However, that a declaration is self-serving is by itself not
19  enough to disregard it at the summary judgment stage:
    "declarations oftentimes will be self-serving--and properly so,
20  because otherwise there would be no point in a party submitting
    them."  Id. at 909 (internal formatting, quotation marks and
21  citation omitted).  Thus, generally, "that an affidavit is self-
    serving bears on its credibility, not on its cognizability for
22  purposes of establishing a genuine issue of material fact."  Id.
    (internal formatting, quotation marks and citation omitted).
23  "Only in certain instances--such as when a declaration states only
    conclusions, and not such facts as would be admissible in
24  evidence,--can a court disregard a selfserving declaration for
    purposes of summary judgment."  Id. (internal quotation marks,
25  formatting and citation omitted).  Thus, to the extent that the
    Court has found above that statements in his declaration were
26  otherwise admissible as evidence, it overrules this objection.

27      Finally, to the extent that Counter-Plaintiffs argue that
    Kalafati's declaration is not credible, credibility disputes are
28  not appropriate for determination on summary judgment.

submitted a price quote to B-Side to provide certain services in connection with the Roosevelt Middle School job.  Thomas Decl., Docket No. 70, Ex. F (Horak Depo. as Rule 30(b)(6) witness of ZEI, hereinafter Horak/ZEI Depo.), 19:16-20:24 & Ex. 5.  The letterhead of the quote listed "Zoom Electric, Inc." and "Zoom Electric Lic. # 857743."  Id.  The quote listed the address of Roosevelt Middle School as 1926 19th Avenue in Oakland, California.  Id.

B-Side had once previously employed Horak as a subcontractor earlier that year, in May 2010, in connection with a job at California State University, East Bay.  Kalafati 2nd Decl., Docket No. 112-2 ¶ 2; Horak/ZEI Depo. 22:14-21.  Before awarding the subcontract for the California State University job,  Anton Kalafati, President and Responsible Managing Officer of B-Side, checked the website of the Contractors State License Board and saw that "Zoom Electric," Horak's fictitious business name, held a valid license.  Kalafati 2nd Decl., Docket No. 112-2 ¶ 2. Kalafati does not state whether he checked the licensing status of Zoom Electric, Inc. as well.

Kalafati attests that, after deciding to award "Zoom Electric" the subcontract on the Roosevelt Middle School job, he sent Horak a version of B-Side's standard subcontractor's agreement by email.  Kalafati 2nd Decl., Docket No. 112-2, ¶ 4. Kalafati attaches to his declaration a copy of the version of the agreement that he says he emailed to Horak, but not of the email itself.  Id., Ex. B.  In the attached version, the subcontractor is identified in two places as "Zoom Electrical," and the "License Number" for the subcontractor is filled in as "857743."  Id.  The

United States District Court
For the Northern District of California

only address that appears for the property at issue in the job is "950 High Street Oakland CA." Id.

Kalafati states in his declaration that Horak sent him an email stating "that the address of the project was incorrect," and that Kalafati then emailed Horak "a corrected version which he brought to my office and signed." Kalafati 2nd Decl., Docket No. 112-2 ¶ 4. Kalafati further attests that, although the version of the document that he sent to Horak identified the subcontractor as "Zoom Electric," the version Horak returned had "Inc." added after "Zoom Electric." Id.[2] Horak did not tell Kalafati of this change and Kalafati did not notice it. Id.

However, in the signed version of the Subcontractor's Agreement, dated August 19, 2010, the address remained "950 High Street Oakland CA" and was not changed. Horak/ZEI Depo., Ex. 5. Also, no license number appears for the subcontractor. Id. In one part of the signed agreement, the subcontractor is referred to as "Zoom Electrical," and in another part, it is identified as "Zoom Electric, INC." Id. (capitalization in original).

Kalafati attests that he noticed this interlineation sometime after the Union began the grievance procedure on December 21, 2010 and he assumed it meant that the contracting party was ZEI, owned by Horak, and not Horak doing business as "Zoom Electric," a sole proprietorship; however, he does not state exactly when he noticed this. Kalafati 2nd Decl., Docket No. 112-2, ¶ 6; Maloon Decl.,

_____

[2] As noted previously, the version attached to Kalafati's declaration, which he attests is the version he emailed to Horak, identifies the sub-contractor as "Zoom Electrical" and not "Zoom Electric," as Kalafati states in his declaration. Kalafati 2nd Decl., Docket No. 112-2, ¶ 4, Ex. B.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Docket No. 43, ¶ 12.  Kalafati represents that he became aware in late March 2011 that ZEI was not licensed.  Kalafati 2nd Decl., Docket No. 112-2, ¶ 6.  Kalafati further states that, throughout the course of the work on the Roosevelt Middle School project, he assumed that B-Side had been dealing with "Zoom Electric," a sole proprietorship, and corroborates this by offering checks that he made out to "Zoom Electric" throughout 2010 and 2011 and tax forms he addressed to "Vieko Horak, Zoom Electric" for those years. Kalafati 2nd Decl., Docket No. 112-2 ¶ 5, Exs. C1 and C2. However, the checks themselves do not corroborate Kalafati's statement that he assumed he was dealing with a sole proprietorship; these exhibits include checks dated as recently as December 2011, long after Kalafati and B-Side learned of the distinction between ZEI and Zoom Electric, and had acknowledged that it had hired the former and not the latter.  Id. at ¶¶ 5, 6, Ex. C2.[3]  Thus, the checks were made out in this way regardless of Kalafati's understanding of the entity with which B-Side had contracted.

On October 14, 2010, three ZEI employees began electrical work on the Roosevelt Middle School project.  Martin Decl., Docket No. 21, ¶ 4; Maloon Decl., Docket No. 43, ¶ 11.  These included: Horak, owner and Chief Executive Officer of ZEI; Aleh Holdvekht,

---

[3] In response to the Union's stop notice sent to OUSD, Kalafati, on behalf of B-Side, sent OUSD an affidavit, dated April 10, 2011, stating that "Zoom Electric, Inc. was hired as an electrical subcontractor."  RJN, Docket No. 107-3, Union's State Court Compl., Ex. I; see also Kalafati 3rd Decl., Docket No. 117-1, ¶ 3 (acknowledging that this exhibit contains B-Side's response to the stop notice).

**United States District Court**
For the Northern District of California

project manager; and Valentin Penkin, electrical wiring supervisor.  Martin Decl., Docket No. 21, ¶ 4.

On December 20, 2010, Union representative Matt Maloon visited Roosevelt Middle School and observed Holdvekht and Penkin working without any accompanying Union workers.  Martin Decl., Docket No. 21, ¶ 4; Maloon Decl., Docket No. 43, ¶ 11.  The Union subsequently began the grievance procedures contained in the PLA for ZEI's work in October through December 2010.  Martin Decl., Docket No. 21, ¶¶ 5-6; Maloon Decl., Docket No. 43, ¶ 12.  On December 21, 2010, Maloon, on behalf of the Union, sent a grievance letter to Horak.  Maloon Decl., Docket No. 43, ¶ 12, Ex. D.  The face of the letter indicates that a copy was sent to B-Side and Kalafati has stated that he received a copy of the grievance.  Id.; Kalafati 2nd Decl., Docket No. 112-2, ¶ 6.

The Union's grievance alleged that, during this period, ZEI failed to comply with the PLA's referral process and that ZEI failed to make contributions to the trust funds on behalf of the employees who had worked on the project.  Maloon Decl., Docket No. 43, ¶ 12, Ex. D.  The Union demanded payment for the wages that should have gone to Union workers and for employee benefit contributions for all hours worked on the project.  Id.  The grievance did not name B-Side as a respondent.  Id.

On or about January 24, 2011, ZEI ordered labor from the Union and journeyman electricians Wilberto Cuellar-Arandia and Douglas R. Lindsey were dispatched to the Roosevelt Middle School fire alarm replacement job.  Maloon Decl., Docket No. 43, ¶ 14.

The JAC held an evidentiary hearing on January 31, 2011 on the Union's grievance about the October through December 2010

United States District Court
For the Northern District of California

violations and subsequently accepted written briefs from the parties. Id. at ¶ 15. According to the JAC's written decision, ZEI had not disputed "that hours were worked in violation of the PLA" and disputed only the amount of money for which it should be liable. Id. at ¶ 17, Ex. G (JAC Decision), 5. ZEI argued that its employees were exempt from coverage by the PLA, because they performed managerial work. Id. at 2-3. ZEI also contended that the Union was seeking to recover "double benefits" to the trust funds instead of the amount that the trust funds would have received had ZEI complied with the PLA, because the Union sought one award for the benefits contribution and a second award for wages, which also included a benefits contribution. Id. at 5-6. Finally, ZEI argued that it should be penalized only for the number of hours that Union workers would have worked had ZEI complied with the referral process. Id. at 3-4, 6.

Kalafati attended the JAC evidentiary hearing as a representative of B-Side. Kalafati 2nd Decl., Docket No. 112-2, ¶ 8. The JAC award issued subsequently noted that he had appeared at the evidentiary hearing "for" ZEI. JAC Decision, 1. Kalafati attests that he "did not participate in the hearing or submissions to the JAC other than to assure the representatives of the Local 595 that going forward B-Side would oversee ZEI's compliance with the Project Labor Agreement and offer a compromise payment to the Union." Kalafati 2nd Decl., Docket No. 112-2, ¶ 8; see also Kalafati Reply Decl., Docket No. 117-1, ¶ 2. He states that he "did not advocate for ZEI" and "did not offer any testimony in ZEI's defense." Kalafati 2nd Decl., Docket No. 112-2 ¶ 8.

On or about February 18, 2011, B-Side submitted to the trust funds reports of hours worked under the PLA by ZEI employees for the month of January 2011.  Maloon Decl., Docket No. 43, ¶ 16, Ex. E.  The reports stated that ZEI owed $1,961.88 in fringe benefit contributions on behalf of Cuellar-Arandia and Lindsey for thirty-two hours of work each.  Id.; Horak/ZEI Depo., Ex. 35.  On or about February 20, 2011, the Union received a timely check from ZEI in the amount of $1,961.88, which the Union forwarded to the trust funds.  Maloon Decl., Docket No. 43, ¶ 16, Ex. F; Horak/ZEI Depo., Ex. 35.  In addition to the thirty-two hours reported, Cuellar-Arandia and Lindsay each worked eight hours for ZEI during the month of January, which ZEI did not report and for which ZEI did not make fringe benefit contributions.  Horak/ZEI Depo., Exs. 37-38.  ZEI's employee, Penkin, also worked thirty-two hours on the project in January 2011, which ZEI did not report and for which ZEI did not make fringe benefit contributions, though payment of these contributions was required by the PLA.  Id.

The JAC issued its written decision on or about February 22, 2011.  Maloon Decl., Docket No. 43, ¶ 17.  The JAC stated in part,

> The JAC considered both the position of the UNION and the EMPLOYER with regard to the payment of Trust Fund benefits on behalf of workers of Zoom Electric, Inc. that worked[] hours in violation of the PLA.  The EMPLOYER states that the payment of hours represents a payment of "double benefits" to the UNION.  In fact, after review of Article IX, Wages, Benefits And Working Conditions, it is clear to the JAC that the benefit payments [do] not go to the benefit of the Union, but rather, specifically they go to the benefit of workers who are entitled to the accrued benefits of such contributions.  For the JAC to not acknowledge that fact would contribute to further victimization of those workers.
>
> The JAC also considered the position taken by the EMPLOYER which would only penalize a violating contractor for hours in the proper ratio as required by

> Article VIII, Referral. . . . To accept this premise
> would be to accept a significant flaw with regard to
> enforcement of the PLA.  Employers that violated the PLA
> with regard to proper dispatch would only be held to
> account, as if they had properly dispatched and had not
> violated the PLA.  That would only create an enticement
> to violate the PLA . . .

JAC Decision, 5-6.  The JAC also credited the Union's argument

that a worker's title did not determine the actual work being

performed and that, if an otherwise management or executive

employee performed non-management tasks, those hours would be

covered by the PLA.  Id. at 3-6.  In so finding and rejecting

ZEI's argument that some of the hours worked should have been

considered exempt by the PLA as managerial work, the JAC found

there was a "credibility concern" for Horak's testimony that the

majority of hours worked were management hours, which was

inconsistent with industry standards and not supported by

evidence.  Id. at 6.  The JAC noted, "Had the hours claimed to be

Management Hours been accompanied with evidence during the

Evidentiary Hearing and had the percentage been consistent with

industry standard, the JAC may have considered those hours as an

error, when listed on the Certified Payroll Records."  Id.  The

JAC thus accepted ZEI's certified payroll records, which were

signed under penalty of perjury by Horak, as a proper showing of

hours covered by the PLA.  Id.

> The JAC ordered ZEI to pay as follows:
>
> Payment to workers on the IBEW 595 Available for Work
> list of 1648 hours totaling $116,299.36
>
> Payment on behalf of employees of Zoom Electric, Inc. to
> the IBEW, 595 Trust Funds totaling $42,963.36 for hours
> worked in violation of the PLA.

Id. at 6.

14

ZEI continued to employ Union labor until sometime in March 2011.  Maloon Decl., Docket No. 43, ¶ 18.  During February 2011, Cuellar-Arandia and Lindsey worked sixteen hours each and Penkin worked thirty-two hours.  Horak/ZEI Depo., Exs. 37-38.  Neither ZEI nor B-Side reported these hours to the trust funds or paid the fringe benefit contributions owed on account of these hours.  Maloon Decl., Docket No. 43, ¶ 18.

On April 6, 2011, ZEI filed the instant action seeking to vacate the JAC award, and amended its pleadings on April 29, 2011. Docket Nos. 1, 11.

On May 6, 2011, the Union answered ZEI's amended pleading and filed a counter-complaint for confirmation and enforcement of the JAC award against both ZEI and Horak.  Docket Nos. 15, 16.

On May 25, 2011, the Union filed a stop notice action in state court.  RJN, Docket No. 107, Ex. A.  In that action, the Union sought a court order pursuant to California Civil Code section 3210, requiring OUSD to release to the Union an amount of money equivalent to the arbitration award, which OUSD had withheld from B-Side pursuant to a stop notice filed with it by the Union. Id.  Prior to being served with the stop notice, B-Side had already paid ZEI and Horak approximately $123,000 of the total subcontract price of $183,600.  Kalafati 2nd Decl., Docket No. 112-2, ¶ 10.  After the Union commenced the state court action to enforce the stop notice, OUSD released the remaining approximately $60,000 to B-Side, which in turn paid it to ZEI and Horak, less an offset to cover B-Side's legal fees in the state court action. Id.  B-Side engaged Benjamin Martin to represent it in the state court action.  Kalafati 3rd Decl. ¶ 3.  Until recently, Martin

represented both ZEI and Horak in this action.  He also

represented B-Side in this action when it was first made a party

to this case in 2012.  See Docket No. 91.

On October 20, 2011, this Court granted the Union's motion

for leave to file a first amended counter-complaint, adding a

second cause of action under the Employee Retirement Income

Security Act (ERISA), 29 U.S.C. §§ 1132, 1145.  Docket No. 54.  In

that claim, the Union alleged that ZEI and Horak failed to make

benefit contributions for work performed under the PLA between

January and March 2011.

On November 18, 2011, the state court granted B-Side's motion

for judgment on the pleadings in the stop notice action.  The

state court found that "the union was not statutorily authorized

to use the stop notice procedure to enforce its claims against ZEI

and its principals."  RJN, Docket No. 107, Ex. B, 3.  The court

reasoned that the state legislature had limited the stop notice

procedure to enforce claims "for materials, equipment, or services

furnished, or labor performed," id. (quoting former Cal. Civil

Code § 3159), and the Union had not alleged facts that could

support a "reasonable inference that it provided materials or

equipment, or furnished services or labor, on the Project," id.

at 2.  Instead, the Union sought to enforce a claim for money owed

"by ZEI and its principals for denying its members the opportunity

to perform work on the project," or "unperformed work."  Id. at

2-3.  The court also noted that the Union was "not listed as one

of the 'persons' entitled to the benefit of the stop notice

remedy."  Id.  The Union subsequently filed a timely notice of

appeal from the order.

United States District Court
For the Northern District of California

On March 20, 2012, this Court granted the Union's motion to confirm and enforce the arbitration award against ZEI and Horak and denied ZEI's cross-motion to vacate the award.  Docket No. 82. The Court also denied ZEI and Horak's motion to dismiss the Union's ERISA cause of action and granted the Union's motion for summary judgment on that claim against ZEI and Horak.  Finally, the Court granted the Union's motion for leave to file a second amended complaint, adding B-Side as a Counter-Defendant, and various Counter-Plaintiffs.  The Union and the other Counter-Plaintiffs sought to hold B-Side liable for both claims pursuant to California Labor Code section 2750.5, as the employer of the unlicensed ZEI.  The Court also directed Counter Plaintiffs to file a verified calculation of the damages requested in the ERISA cause of action, specifically a calculation of the contributions that ZEI failed to make, liquidated damages and interest.

On March 27, 2012, Counter-Plantiffs filed a verified calculation of damages on the second cause of action, showing ZEI's balance due on that date, including accrued interest, as $3,581.41.  Docket No. 84.

On June 27, 2012, the Court denied B-Side's motion to dismiss both claims against it.  Docket No. 102.  B-Side had brought this motion through the attorney that it had shared with ZEI and Horak, Benjamin Martin.  See Docket Nos. 90, 91.

On July 24, 2012, B-Side filed a notice of substitution of counsel in the instant case, substituting Attorney William C. Last, Jr. for Martin.  Docket No. 103.  B-Side continues to be represented in state court by Martin.

**United States District Court**
For the Northern District of California

1    The following day, on July 25, 2012, B-Side filed its answer

2  to the second amended complaint.  Docket No. 104.

3    Twenty-one days after filing its answer, on August 15, 2012,

4  B-Side brought a cross-claim for indemnification against Horak,

5  doing business as Zoom Electric.  Docket No. 105.

6    On August 28, 2012, Horak filed a notice of substitution of

7  attorney removing Martin and substituting himself in pro per.

8  Docket No. 106.

9    On October 25, 2012, the Court held a hearing on the instant

10  motions.  Docket No. 119.

11    On December 3, 2012, thirty-nine days after the hearing,

12  B-Side moved for entry of default.  Docket No. 120.  On December

13  5, 2012, the Clerk entered default against Horak on B-Side's

14  cross-claims.  Docket No. 122.

15    On December 5, 2012, ZEI filed a notice of substitution of

16  counsel, removing Martin as its counsel and substituting Attorney

17  Eric Milliken in his place.  Docket No. 121.

18    On December 11, 2012, Milliken filed a motion to set aside

19  Horak's default, which was denied on January 17, 2013.  Docket

20  Nos. 125, 132.

21    On January 23, 2013, Horak filed for bankruptcy.  Docket No.

22  133.

23                          DISCUSSION

24  I.  Motion to Stay

25    B-Side moves to stay the instant action, pending the

26  resolution of the appeal of the stop notice action in state court,

27  under the abstention doctrines addressed by the Supreme Court in

28  Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25

                              18

(1959), and <u>Colorado River Water Conservation Dist. v. United States</u>, 424 U.S. 800 (1976).

A. <u>Thibodaux</u> abstention

In <u>Thibodaux</u>, the Supreme Court addressed abstention in diversity cases.  In the absence of "exceptional circumstances" in such cases, a federal court is not permitted to abstain from determining questions of state law necessary to deciding the cases before it "merely because the answers to the questions of state law are difficult or uncertain or have not yet been given by the highest court of the state."  <u>Meredith v. Winter Haven</u>, 320 U.S. 228, 234-235 (1943).  Abstention only is "appropriate where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar."  <u>Colorado River</u>, 424 U.S. at 814 (discussing <u>Thibodaux</u>).

In <u>Thibodaux</u>, the city initiated an eminent domain proceeding in state court, and the defendant removed the action to federal court on the basis of diversity jurisdiction.  360 U.S. at 25.  On its own motion, the district judge decided to stay the proceedings to allow the state court to interpret the relevant statute to determine whether the city had the authority to take the subject property.  <u>Id.</u> at 26.  The Supreme Court upheld the district judge's decision, recognizing that the "special and peculiar nature" of eminent domain proceedings, particularly in the case at hand, which dealt with the "the nature and extent of delegation . . . of governmental power between the city and state" and was "intimately involved with the sovereign prerogative."  <u>Id.</u> at 28. Under <u>Thibodaux</u>, "the federal courts should abstain in diversity

19

**United States District Court**
For the Northern District of California

cases if there is uncertain state law <u>and</u> an important state interest that is 'intimately involved' with the government's 'sovereign prerogative.'" <u>Moore's Federal Practice 3d</u> § 122.03[5] (emphasis in original); <u>see also</u> <u>Nature Conservancy v. Machipongo Club, Inc.</u>, 579 F.2d 873, 875 (4th Cir. 1978) (reading this doctrine "as permitting abstention in diversity cases where (1) state law is unsettled, and (2) an incorrect federal decision might embarrass or disrupt significant state policies.").

<u>Thibodaux</u> abstention is inapplicable in this case, in which federal jurisdiction is not based on diversity of citizenship. <u>See</u> Chemerinsky, <u>Federal Jurisdiction</u> § 12.2 (2007) (recognizing that <u>Thibodaux</u> addresses abstention in diversity cases); <u>Moore's Federal Practice 3d</u> § 122.03 (same). Notably, B-Side has not cited any case in which a court applied <u>Thibodaux</u> abstention outside of the diversity context. Further, although B-Side contends that "the Court's jurisdiction in the instant case is based upon supplemental jurisdiction" and that <u>Thibodaux</u> should apply because state law is at issue, Mot. to Stay, 3 n.5; Reply in Supp. of Mot. to Stay, 3 n.5, the Court already has determined that its jurisdiction over the claims against B-Side are not based on supplemental jurisdiction and instead arise under both federal and state law.

B-Side previously moved to dismiss the first cause of action, arguing that the federal claims have been adjudicated in this case and that the Court lacks supplemental jurisdiction to decide whether to hold it liable pursuant to California Labor Code section 2750.5. The Court rejected this argument, stating,

> The first counter-claim in this action is brought against all three Counter-Defendants, seeking to confirm and enforce the arbitration award under section 301 of the Labor-Management Relations Act [(LMRA)], 29 U.S.C. § 185 and holding B-Side liable for that violation through California Labor Code section 2750.5. . . . The theory of the counter-claim against B-Side is that the arbitration award should be confirmed and enforced pursuant to federal law against ZEI and that B-Side should be held liable for the award pursuant to state law.  This is not two distinct claims, as B-Side characterizes it.  For B-Side to be found liable for anything, the underlying liability based on federal law must be found as well as the obligation imputing that liability to B-Side directly.  The claim against B-Side thus arises under both state and federal law.

Docket No. 102, 4-5.  Similarly, the second cause of action alleges that ZEI breached the collective bargaining agreement and failed to make contributions to the Trust Funds, in violation of § 301 of the LMRA and §§ 502 and 515 of ERISA, and that B-Side is liable for this failure pursuant to state law.  In the prior order, the Court also held that, even if the claims against B-Side were distinct from those against ZEI and Horak and arose under state law, the Court has supplemental jurisdiction over them and would not exercise its discretion to decline that jurisdiction. Id. at 5-9.[4]

In addition, although there is no authority that is directly on point regarding the applicability of California Labor Code section 2750.5 to ERISA and LMRA claims, B-Side has not articulated a basis for abstention that shows that the legal issue in this case is "intimately involved" with "sovereign

---

[4] However, even where a court has already considered its discretion under 28 U.S.C. § 1367(c) to weigh the values of judicial economy, comity, convenience and fairness and has determined that those interests would be best served by exercising jurisdiction over the claims, principles of abstention still may oblige a district court to stay or dismiss state law claims.  See City of Chi. v. Int'l College of Surgeons, 522 U.S. 156, 174 (1997).

prerogative," such as eminent domain, or that it bears "on policy problems so important that they transcend the result in this case." Kern-Tulare Water Dist. v. City of Bakersfield, 828 F.2d 514, 517 (9th Cir. 1987). B-Side makes only conclusory statements to this effect, such as that the case will determine "what rights . . . unions and their members have under state law against contractors and other parties" for breach of project labor agreements "by subcontractors which denied union members their contractual right to work on that project," and that "it is difficult to see any statutory protection for workers who have not worked on such projects." Mot. to Stay, 4. Although B-Side refers summarily to "California's extensive regulation of contractor-employee ('laborer') relationships, particularly for public works projects" as a "matter of 'substantial public import,'" Reply in Supp. of Mot. to Stay, 4, it does not explain how the questions actually presented in this case in particular are of sufficient import to make this the exceptional case in which abstention is required. Further, that the question may be "difficult" is not enough to warrant abstention. See Meredith, 320 U.S. at 234-235.

Finally, this case deals with rights under federal law, namely ERISA and the LMRA, as well as under state law. The federal court has exclusive jurisdiction over the ERISA cause of action for delinquent benefits contributions, and thus a state court would not be able to determine the interplay between ERISA and California Labor Code section 2750.5.

Accordingly, the Court DENIES B-Side's request for a stay based on Thibodaux abstention.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

B. Abstention under the Colorado River doctrine

Pursuant to the Colorado River doctrine, in situations involving the contemporaneous exercise of jurisdiction by different courts over sufficiently parallel actions, a federal court has discretion to stay or dismiss an action based on considerations of wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation.  424 U.S. at 817.  The two actions need not exactly parallel each other to invoke the Colorado River doctrine; it is enough that the two cases are substantially similar.  Nakash v. Marciano, 882 F.2d 1411, 1416 (9th Cir. 1989).  However, "the requirement of 'parallel' state court proceedings implies that those proceedings are sufficiently similar to the federal proceedings to provide relief for all of the parties' claims."  Intel Corp. v. Advanced Micro Devices, Inc., 12 F.3d 908, 913 n.4 (9th Cir. 1993).  Thus, "the existence of a substantial doubt as to whether the state proceedings will resolve the federal action precludes the granting of a [Colorado River] stay."  Smith v. Cent. Ariz. Water Conservation Dist., 418 F.3d 1028, 1033 (9th Cir. 2005) (quoting Intel Corp., 12 F.3d at 913); see also Moses H. Cone Hospital v. Mercury Constr. Corp., 460 U.S. 1, 28 (1983) ("When a district court decides to dismiss or stay under Colorado River, it presumably concludes that the parallel state-court litigation will be an adequate vehicle for the complete and prompt resolution of the issues between the parties.  If there is any substantial doubt as to this, it would be a serious abuse of discretion to grant the stay or dismissal at all.").

In the case at hand, B-Side argues that "the entire basis for B-Side's liability is not federal labor law but the state's laws pertaining to licensing and liabilities of construction contractors." Reply in Supp. of Mot. to Stay, 4. However, as discussed above, the Court has already rejected B-Side's argument that the claims asserted against it in this action arise only under state law. The Court has previously held that, for B-Side to be found liable for anything, the Court must find both the underlying liability based on federal law and the obligation under state law imputing that liability to B-Side. Thus, the applicability of California Labor Code section 2750.5 is not a separate claim, as B-Side continues to urge.

Further, the second cause of action, which seeks compensation for amounts other than in the arbitration award, is not at issue at all in the state court action, which B-Side admits. Reply at 4. As noted above, the second cause of action is an ERISA claim for delinquent benefits contributions, which is within the exclusive jurisdiction of the federal courts, and which cannot be resolved by the state courts. Because that cause of action necessarily requires a determination by a federal court and not the state court, and is not asserted in the state court action, this Court cannot invoke the Colorado River doctrine to stay or dismiss this action. See Moses H. Cone, 460 U.S. at 28 ("the decision to invoke Colorado River necessarily contemplates that the federal court will have nothing further to do in resolving any substantive part of the case, whether it stays or dismisses").

Finally, B-Side's argument that the state court action will be determinative of the proper application of California Labor

Code section 2750.5 in this case is unpersuasive.  B-Side contends the state court's interpretation of who can use the stop notice procedure will resolve the interpretation of California Labor Code section 2750.5.  However, the statutes themselves are very different.  Even after the state court has interpreted the stop notice laws, this Court will still be required to interpret and apply Labor Code section 2750.5, making a <u>Colorado River</u> stay inappropriate, as noted above.

The state law provision at issue in this case provides,

> There is a rebuttable presumption affecting the burden of proof that a worker performing services for which a license is required pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code, or who is performing such services for a person who is required to obtain such a license is an employee rather than an independent contractor.  Proof of independent contractor status includes satisfactory proof of these factors:
>
> (a) . . .
>
> (b) . . .
>
> (c) . . .
>
> In addition to the factors contained in subdivisions (a), (b), and (c), any person performing any function or activity for which a license is required pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code shall hold a valid contractors' license as a condition of having independent contractor status.
>
> For purposes of workers' compensation law, this presumption is a supplement to the existing statutory definitions of employee and independent contractor, and is not intended to lessen the coverage of employees under Division 4 and Division 5.

Cal. Labor Code § 2750.5.  Courts have found that this provision also created "an employer-employee relationship between the ultimate hirer and the employees of the unlicensed contractor." <u>Rinaldi v. Workers' Comp. Appeals Bd.</u> (<u>Rinaldi I</u>), 196 Cal. App.

3d 571, 574 (1987) (quoting <u>Blew v. Horner</u>, 187 Cal. App. 3d 1380, 1389 (1986)).

In contrast, the stop notice laws that were in effect at the time the state court action was filed,[5] which are contained in the Civil Code, provide, "Except for an original contractor, any person mentioned in Section 3110, 3111, or 3112, or in Section 4107.7 of the Public Contract Code, or furnishing provisions, provender, or other supplies, may serve a stop notice upon the public entity responsible for the public work in accordance with this chapter." Cal. Civ. Code § 3181, repealed July 1, 2012. The former California Civil Code sections 3110, 3111 and 3112 appeared in the section of the civil code that addresses what individuals are entitled to mechanics' liens. Former section 3110 listed various particular types of tradesmen and provided that they and

> all persons and laborers of every class performing labor upon or bestowing skill or other necessary services on . . . a work of improvement shall have a lien upon the property upon which they have bestowed labor . . . for the value of such labor done . . . whether done or furnished at the instance of the owner or of any person acting by his authority or under him as contractor or otherwise.

Cal. Civ. Code § 3110, repealed July 1, 2012. Former Civil Code section 3089 defined laborer as "any person who, acting as an employee, performs labor upon or bestows skill or other necessary services on any work of improvement," including "any person or entity, including an express trust fund described in Section 3111, to whom a portion of the compensation of a laborer . . . is paid

---

[5] Effective July 1, 2012, these provisions were recodified. B-Side contends, and Counter-Plaintiffs do not dispute, that the recodification does not affect the pending state court action. Mot. to Stay, 7 n.8.

by agreement with that laborer or the collective bargaining agent of that laborer."  Cal. Civ. Code § 3089, repealed July 1, 2012.

A finding that, under these provisions, the stop notice procedures can be only used to recover compensation for labor that was actually performed is not determinative of whether, under Labor Code section 2750.5, a general contractor can be held responsible for an unlicensed subcontractor's failure to pay benefits on behalf of its workers under a collective bargaining agreement or wages to laborers who should have been hired under such an agreement but were not.  It also does not appear that the stop notice laws are useful for interpretation of Labor Code section 2750.5 and notably, in its arguments about the proper interpretation of the latter in the cross-motions for summary judgment, B-Side does not once cite the stop notice provisions.

Accordingly, because the state case is not "an adequate vehicle for the complete and prompt resolution of the issues between the parties," Moses H. Cone, 460 U.S. at 28, the Court DENIES B-Side's motion to stay under the Colorado River doctrine.

II.  Cross-Motions for Summary Judgment

A. Legal Standard

Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and when, viewing the evidence most favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of law.  Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Eisenberg v. Ins. Co. of N. Am., 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  Celotex, 477 U.S. at 324; Eisenberg, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

B. Discussion

Counter-Plaintiffs argue that the Court need only determine that B-Side is legally responsible under California Labor Code section 2750.5 for the liabilities that the Court previously found against ZEI and Horak for the arbitration award and the failure to make benefit contributions for work performed in January through March 2011.

B-Side responds that the Court's Order adjudicating these claims against ZEI and Horak are not binding upon it because it was not a party to the case at that point and is not in privity with ZEI or Horak.  However, it is not necessary that B-Side be in privity with ZEI or Horak.  It is Labor Code section 2750.5 that makes B-Side responsible for liabilities incurred by them.

**United States District Court**
For the Northern District of California

B-Side also contends that Counter-Plaintiffs have not offered any evidence that the arbitration award is correct or that ZEI failed to make benefits contributions for work performed in January through March 2011. However, the Union submitted substantial evidence in connection with the prior motions and incorporated the record into this motion by reference. Thus, the Court takes into account all of the evidence that it considered when deciding to adjudicate these claims in the Union's favor and against ZEI and Horak previously. The Court need only determine whether the new evidence and arguments raised by B-Side warrant a different decision.

As previously noted, a finding against B-Side on each claim consists of two parts: first, a finding of liability against ZEI under federal law; and second, a finding that the liability is imputed to B-Side under state law.

1. Federal Jurisdiction

B-Side argues that Counter-Plaintiffs have made no showing that "the PLA is a 'collective bargaining agreement'" and therefore that the "Court has subject matter jurisdiction under the NLRA as pled in the SACC." B-Side's Opp. to Counter-Pls.' Mot. for Summ. J. and Cross-Mot. 5. B-Side has not challenged subject matter jurisdiction under ERISA as to the second cause of action.

The LMRA covers suits "for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act, or between any such labor organizations." 29 U.S.C. § 185. On their faces, the PLA and other relevant agreements in the record are such

**United States District Court**
For the Northern District of California

contracts.  Accordingly, the Court rejects B-Side's argument that it does not have jurisdiction over the first cause of action.

### 2. B-Side's liability for unpaid benefits contribution for work performed in January through March 2011

The Court previously found that the evidence in the record was sufficient to show that ZEI had failed to make required benefits contributions for work performed in January and February 2011.  B-Side now claims that the "only evidence in the record supporting it is a verified statement showing a calculation of the amount of the claim," and that Counter-Plaintiffs have submitted no evidence pertaining to this claim.  Reply at 9.  However, this is inaccurate.  In fact, that document was only submitted after the Court granted summary judgment on this claim, at the request of the Court to facilitate the calculation of the amount of damages, although the relevant information was already in the record.

In the prior summary judgment order, the Court found that Counter-Plaintiffs had offered evidence that, in January 2011, two Union members, Wilberto Cuellar-Arandia and Douglas R. Lindsey each worked eight hours for ZEI on the Roosevelt Middle School project, that ZEI's employee, Valentin Penkin, also worked thirty-two hours on the project in January 2011, and that, during February 2011, Cuellar-Arandia and Lindsey worked sixteen hours each and Penkin worked thirty-two hours.  Docket No. 82, 6-7; see also Horak Depo., Docket No. 70-6, Ex. 38 (payroll records for January 31, 2011 through February 6, 2011).  The Court also found that Counter-Plaintiffs provided evidence that neither ZEI nor B-Side reported these hours or made fringe benefits contributions

for them, although payment of these contributions was required by the PLA.  Docket No. 82, 6-7; see also Maloon Decl., Docket No. 43, ¶ 18.  Thus, there is sufficient evidence in the record that the required benefits contributions were not made during this time period, and B-Side has not offered evidence to create a material dispute of fact.

In addition, the verified calculation of damages is admissible evidence of the amount of damages suffered.  It was authenticated under penalty of perjury by the administrator for the Trust Funds and shows a calculation of the contributions required for the above hours, the liquidated damages and the interest accumulated through the date on which it was signed.  The figures underlying these calculations--the aggregate trust fund contribution rate for Union journeymen during the relevant time period, the number of hours worked during the time period, the percentage for liquidated damages, and the interest rate--are all part of the record, and are contained in the PLA, schedules and time sheets.  B-Side has not presented any argument or evidence that the calculation itself is erroneous.

Further, there is no material dispute of fact that B-Side should be held liable for this claim.  California state courts have held that Labor Code section 2750.5, quoted above, "operates to conclusively determine that a general contractor is the employer of not only its unlicensed subcontractors but also those employed by the unlicensed subcontractors."  Sanders Const. Co., Inc. v. Cerda, 175 Cal. App. 4th 430, 434-35 (2009) (quoting Hunt Bldg. Corp. v. Bernick, 79 Cal. App. 4th 213, 220 (2000) (collecting cases)); see also Blew, 187 Cal. App. 3d at 1389

United States District Court
For the Northern District of California

("among the consequences which flow from a determination that a person is an employee rather than an independent contractor is that an employer-employee relationship exists between the hirer of the employee and those whom the employee has hired to do the hirer's work").  "Thus, where a 'subcontractor is unlicensed, workers' compensation liability for the subcontractor's employees will be imposed on the general contractor as a matter of law.'" Hunt, 79 Cal. App. 4th at 220 (quoting Rinaldi I, 196 Cal. App. 3d at 574).  "Similarly, a general contractor is liable to [the California Employment Development Department] for unpaid contributions [to unemployment and disability insurance funds] and withholding taxes for its unlicensed subcontractor's employees." Id. (citations omitted); see also Sanders Const., 175 Cal. App. 4th at 434-35 (holding that a general contractor may be held liable for the unpaid wages of workers hired by an unlicensed company that is its subcontractor).

B-Side acknowledges that it subcontracted with ZEI, the corporate entity, and that ZEI was unlicensed from January through March 2011 when ZEI employed Cuellar-Arandia, Lindsey and Penkin to perform work on the Roosevelt Middle School project.  B-Side also concedes that ZEI was required to be licensed.  Thus, by operation of section 2750.5, B-Side, the general contractor, is the employer of Cuellar-Arandia, Lindsey and Penkin.  The PLA provides that the employing contractor is required to "pay contributions to the established vacation, pension or other form of deferred compensation plan, apprenticeship, and health benefit funds for each hour worked on the Project."  PLA ¶ 9.1; see, e.g., Maloon Decl., Docket No. 43, Ex. B § 6.04(b) ("The Employer agrees

to pay the amount specified in Appendix A for each hour worked by all employees working under the terms of this Agreement in and to said Pension Trust . . .").

In Hunt, the California Court of Appeal held that a general contractor was liable for contributions to state disability and unemployment funds that its unlicensed subcontractors had failed to make on behalf of their employees. Hunt, 79 Cal. App. 4th at 223. The court noted that state law placed the obligation on employers to contribute to the unemployment fund based on wages paid to their employees and to withhold employees' contributions to the disability fund from their wages. Id. at 219. However, "where an independent contractor performs services for a principal, the principal is not required to withhold taxes or make contributions." Id. The court found that, because section 2750.5 rendered the unlicensed subcontractors and their employees to be the employees of the general contractor, the general contractor was required to withhold taxes and make contributions on behalf of the subcontractors and their employees. Id. at 223. Other courts have also found the general contractor responsible for any liabilities that it would otherwise have as the employer of the unlicensed subcontractor's employees, such as workers' compensation claims, contributions to unemployment funds and wages. See, e.g., Sanders Const., 175 Cal. App. 4th at 434-35 (wages; collecting cases); Zellers v. Playa Pacifica, Ltd., 61 Cal. App. 4th 129, 132-134 (1998) (workers' compensation benefits).

Similarly, here, the PLA and Schedule A require the employing contractor to make contributions to the trust funds on behalf of

United States District Court
For the Northern District of California

its employees.  Because ZEI was unlicensed, ZEI's employees were the employees of B-Side by statute.  Thus, B-Side is liable for the unpaid benefits contributions for these employees.

In response, B-Side argues that the "Court should pierce ZEI's corporate veil for the purpose of assessing B-Side's liability."  Reply at 9.  Specifically, B-Side contends that, because the Court pierced ZEI's corporate veil to find Horak individually liable for the judgments against ZEI, the Court should pierce the veil for all purposes, with the result "that B-Side was doing business with a licensed contractor because it is undisputed that the entire time that Horak worked on the subject project he was individually licensed as an electrical contractor." B-Side's Opp. to Counter-Pls.' Mot. for Summ. J. and Cross-Mot. 11.  However, in its reply, B-Side changes its request, stating that it is not contending that the Court should deem ZEI to be licensed, but instead that, because B-Side knew that Horak was licensed and thought it was doing business with him and not ZEI, the Court should not find that B-Side liable "in the interests of justice."

Although B-Side may be able to prevail on its cross-claim for indemnification against Horak, B-Side cites no authority for piercing the corporate veil to thwart section 2750.5.  Such a result would contravene clear California law that a corporation is a separate legal entity from its officers and does not gain a license simply because an officer is separately licensed.  See, e.g., Opp v. St. Paul Fire & Marine Ins. Co., 154 Cal. App. 4th 71, 76-80 (2007) (a corporation may not claim "substantial compliance" with the licensing requirement if it has never been

**United States District Court**
For the Northern District of California

licensed within the state of California, even if its managing officer and sole owner was duly licensed throughout the relevant time period); WSS Indus. Constr., Inc. v. Great West Contractors, Inc., 162 Cal. App. 4th 581, 596 (2008) (reaching the same conclusion, irrespective of the president's licensing history, good faith or competence).

Further, to hold that the general contractor could escape obligations to the subcontractor's employees under section 2750.5 because the subcontractor acted in bad faith disregards the premise of the statute and places the consequences of Horak and ZEI's misrepresentation onto the employees and trust funds, which would be denied the benefits contributions. Courts have found that, where a subcontractor has falsely represented his licensing status to the general contractor, although the subcontractor may be estopped from denying his independent contractor status, this does not extend to the innocent employees of the subcontractor, who may properly obtain workers' compensation from the general contractor. See Rinaldi v. Workers' Comp. Appeals Bd. (Rinaldi II), 199 Cal. App. 3d 217, 224 (1988); Nick Hagopian Drywall v. Workers' Comp. Appeals Bd., 204 Cal. App. 3d 767, 772-773 (1988). In so holding in Rinaldi II, the court recognized,

> Although Labor Code section 2750.5 was not designed as a penalty . . ., it is the ultimate hiring contractor, rather than the injured worker or the [state Uninsured Employers Fund], who has the opportunity and incentive to check the credentials of the subcontractors he hires. By failing to do so, the hiring contractor not only aids and abets the unlicensed subcontractor but also sets in motion the chain of events whereby the injured worker is robbed of the protection provided to him by the workers' compensation law.

Id. at 1226.  Similarly, here, a contrary finding would rob the employees of their benefits under the PLA.  Although Horak and ZEI may have attempted to conceal ZEI's unlicensed status from B-Side, and B-Side may not have intended to hire an unlicensed subcontractor, as between B-Side, the employees and the Trust Funds, B-Side was in the best position to investigate ZEI's credentials.  The undisputed record shows that B-Side had such opportunities: the bid letter from ZEI clearly stated "Zoom Electric, Inc." and B-Side could have noticed the removal of the license number and the change to ZEI's name in the subcontractor's agreement had it reviewed that more carefully.  Allocating equities among the parties does not favor B-Side over the employees and trust funds, which are entitled to the benefits contributions.

Finally, B-Side argues that it would be inequitable to hold it liable because it already disbursed to ZEI full payment for the work done at the Roosevelt Middle School job and, if that result is reached, it would be required to pay this amount again.  This argument is unavailing.  B-Side makes no showing that it was required to do so, and it chose to make the final payments with the knowledge that it might be held liable for this amount.

This result is also consistent with certain public policy considerations underlying section 2750.5.  In Hunt, the court noted that, at the time it was passed, "the Assembly Committee on Labor, Employment and Consumer Affairs reported that the portion of the bill containing Labor Code section 2750.5 would 'provide criteria for determining whether employers are avoiding payment of their social insurance tax obligations by treating their employees

United States District Court
For the Northern District of California

as independent contractors'" and that it "would help end the 'subterranean economy' where contractors hire unlicensed subcontractors and pay them in cash, resulting in the 'loss of large sums in taxes, employee social insurance contributions, and employee pension funds.'"  79 Cal. App. 4th at 222 (quoting Assem. Com. on Labor, Employment & Consumer Affairs, Analysis of Assemb. Bill 3249 (1977-1978 Reg. Sess.), 1).  In Sanders, the California Court of Appeal observed that the "same public policy considerations regarding the subterranean economy" arise where "an unscrupulous general contractor could collude with an unlicensed subcontractor to cheat workers hired by the subcontractor out of their wages, plus all of the related benefits."  175 Cal. App. 4th at 435.

Accordingly, the Court grants Counter-Plaintiffs' motion for summary judgment on the second cause of action and denies B-Side's cross-motion for summary judgment on it.

3. Confirmation of the Arbitration Award

B-Side argues that the arbitration award cannot be confirmed with respect to it because it was not a party to the arbitration proceedings and did not have an opportunity to contest them. B-Side raises two issues with the arbitration proceedings and award that it contends, had it been part of those proceedings, it would have raised, and argues that this means that the arbitration award should be vacated.

First, B-Side suggests that the evidentiary hearing of the JAC was not conducted in compliance with the terms of the PLA. B-Side states that Step One of the grievance procedure provides that first "the Business Representative of the involved Local

Union or District Council, or his/her designee, and the representative of the involved Contractor shall confer and attempt to resolve the grievance."  B-Side's Opp. to Counter-Pls.' Mot. for Summ. J. and Cross-Mot. 8 (citing PLA § 12.2).  Implying that the JAC hearing comprised Step One of the procedure, B-Side complains that the hearing was conducted by Barry Luboviski and Gene Johnson, the latter included as the "contractor."  Id. B-Side asserts that Johnson was an employee of a consulting firm, Davallier Sloan, and not a licensed contractor who worked on the project.  Id. (citing Kalafati 2nd Decl. ¶ 8).

This argument is unavailing for a number of reasons.  The JAC hearing was not part of Step One of the grievance process.  See PLA § 12.2 ("Step 2: In the event that the representatives are unable to resolve the dispute" in Step One, an involved party may submit the grievance "to the Joint Administrative Committee"). The grievance letter that constituted Step One of the procedure was sent by a Union representative, Maloon, to a representative of the involved contractor, Horak, and was also sent to Kalafati, on behalf of B-Side.  B-Side cites nothing in the record that requires that one member of the JAC Committee be a contractor. Finally, the only evidence about Johnson's employment or status that B-Side has cited is inadmissible hearsay within Kalafati's declaration.

Second, B-Side argues that Horak was an executive or managerial employee and thus that the hours that he worked were not subject to the PLA, such that the JAC's award of fringe benefits to the Union on his behalf was improper.  B-Side contends that the JAC simply ignored the provision of the PLA that excluded

38

**United States District Court**
For the Northern District of California

from its coverage executives and managerial employees.  B-Side's
Opp. to Counter-Pls.' Mot. for Summ. J. and Cross-Mot. 10-11 n.10.
B-Side does not raise the same argument as to the hours worked by
the other two employees.

B-Side's assertion that the arbitrators ignored this
provision is inaccurate.  This argument was brought up before the
JAC, which considered and rejected it.  The JAC found that the PLA
excluded from its coverage executive and managerial employees only
when they performed work within those job descriptions, not tasks
that would normally be performed by a laborer who would be covered
by the PLA.  The JAC found that ZEI and Horak did not submit
credible evidence that any work performed by Horak was actually
managerial.  This conclusion is a "plausible interpretation" of
the PLA and thus is entitled to judicial deference.  B-Side
presents no such evidence either.  Accordingly, B-Side has failed
to raise a material dispute of fact that the JAC award should not
be confirmed.

B-Side contends that it should not be held liable for the
portion of the JAC award that was for "Payment on behalf of
employees of Zoom Electric, Inc. to the IBEW, 595 Trust Funds
totaling $42,963.36 for hours worked in violation of the PLA."
This portion of the award was intended to compensate for the
unpaid fringe benefits contributions to the trust funds on behalf
of those ZEI employees who actually worked on the Roosevelt Middle
School project during the relevant time period, including Horak.
As discussed above, by operation of section 2750.5, B-Side is the
employer of these three ZEI employees.  Accordingly, under the
authority discussed above, B-Side is liable for the unpaid

United States District Court
For the Northern District of California

benefits contributions that were required to be made on their behalf.

B-Side contends that it cannot be held liable for this amount for several reasons. First, it argues that section 2750.5 is meant to operate for the benefit of the employees of the unlicensed subcontractor, so it cannot be used to require B-Side to make payments to the trust funds in the absence of evidence that the trust funds will in fact pay these amounts to those employees. However, B-Side offers no authority to support that only the employees themselves may benefit from section 2750.5 or that evidence must be offered that the employee will directly benefit from its operation. The text of the statute creates no such requirement. As previously stated, section 2750.5 makes B-Side, as the general contractor, the employer of ZEI's employees. Thus, B-Side has the same legal responsibilities with respect to these individuals as it would with respect to any other employees. In addition, part of the intent underlying section 2750.5 was to ensure that the use of unlicensed subcontractors would not result in substantial loss in contributions to employee social insurance and pension funds and to further the public policy of ensuring that such funds are properly funded. See Hunt, 79 Cal. App. 4th at 222-23. Other courts have held that section 2750.5 makes a general contractor liable for unpaid contributions to funds meant to provide benefits for persons who are unemployed through no fault of their own or through injury or sickness. See, e.g., id. at 218. These cases do not discuss any requirement that the fund show the individual employee will directly obtain a benefit immediately or in the future. Unemployment and disability

United States District Court
For the Northern District of California

insurance contributions are not earmarked for individuals and there is no guarantee that participating eligible employees will become unemployed or disabled.

B-Side also argues that it should not be required to pay the portion of the $42,963.36 component of the JAC award that is attributable to Horak's labor.  It contends that section 2750.5 cannot be used to make him its employee because he himself held a contractor's license, even though ZEI did not.  However, it is irrelevant to the operation of section 2750.5 here that Horak himself had a license.  The code section makes ZEI the employee of the B-Side because it was unlicensed and makes B-Side liable for ZEI's unmet obligations for its employees.  The JAC found that ZEI had not met its obligation to pay the benefits contributions on behalf of its employees who worked on the project, including Horak, and, as previously stated, B-Side has offered no evidence to dispute its conclusion.  Citing Chin v. Namvar, 166 Cal. App. 4th 994 , 1004-06 (2008), B-Side also argues that Horak is estopped from collecting compensation from it because he affirmatively represented ZEI's contractor's licensing status.  In Chin, the court held, based on estoppel, that an individual who had himself misrepresented his licensing status to a company could not maintain certain causes of action against that company that were dependent on a finding that he was an employee of the company rather than its independent contractor.  Chin, 166 Cal. App. 4th at 1002-06.  However, B-Side offers no authority that this estoppel extends to trust funds seeking unpaid contributions to employee funds.

41

B-Side also disputes its liability for the portion of the JAC award that was for "Payment to workers on the IBEW 595 Available for Work list of 1648 hours totaling $116,299.36." This portion of the award was intended to compensate workers who would have been eligible to work on the project but who were not employed because of ZEI's failure to abide by the PLA's referral provisions. Thus, it compensated individuals who would have been employees of ZEI but were not, because of ZEI's malfeasance. B-Side argues that section 2750.5 cannot operate to make these individuals its employees because that code section affects the burden of proof for "a worker performing services for which a license is required" and these individuals did not perform services on the Richmond Middle School project. B-Side contends that, as a result, it is not responsible for ZEI's injury to these third parties.

However, ZEI did perform services for which a license was required, did not have a license and, by operation of section 2750.5, was made an employee of B-Side at the time that it caused the injury to these third parties for which this portion of the award was intended to compensate. On its face, section 2750.5 does not affect employment status only in cases seeking recovery of wages and benefits. As pointed out by Counter-Plaintiffs at the hearing, at least one California court has found the code section applicable to tort cases involving injuries to third parties. See Foss v. Anthony Industries, 139 Cal. App. 3d 794 (1983) (concluding, however, that it was not retroactive). In Foss, a company hired an unlicensed partnership to excavate a swimming pool site, work for which a license was required. Id. at

42

United States District Court
For the Northern District of California

796-97.  A truck driven by an employee of the partnership struck and killed a motorcyclist.  *Id.* at 796. The administrator of the motorcyclist's estate brought suit against the company and the partnership.  *Id.*  The trial court concluded that section 2750.5 applied only in workers' compensation cases, not in tort, and granted nonsuit in favor of the company.  *Id.* at 797.  The Court of Appeal reversed, finding that it applied both to workers' compensation and tort cases.  *Id.* at 797-99.  The appellate court noted that it was "clear the basic provisions of the Labor Code on employee status are not limited to cases involving disputes between employer and employee" and that such provisions have long been cited "on employment status in tort cases involving injuries to third parties."  *Id.* at 798.  The court recognized that "strong public policy" supported the application of section 2750.5 in such instances because it was "consistent with the reasoning of imposing vicarious liability under the doctrine of respondeat superior" upon an employer for the torts of an independent contractor, including that "he is the party primarily benefited by it, that he selects the contractor, is free to insist upon one who is financially responsible, and to demand indemnity from him."  *Id.* at 799.  The court concluded that it was consistent with that policy approach to deny "an employer the opportunity to raise the independent contractor defense if he has hired a worker who has not shown the competence and financial responsibility prerequisites to obtaining a contractor's license."  *Id.* Similarly, here, section 2750.5 applies to make B-Side the employer of ZEI and thus responsible for ZEI's failure to hire

United States District Court
For the Northern District of California

1 laborers for the project in compliance with the provisions of the

2 PLA, to which both B-Side and ZEI were parties.

3    Accordingly, the Court grants Counter-Plaintiffs' motion for

4 summary judgment on the first cause of action and denies B-Side's

5 cross-motion for summary judgment on it.

6                                CONCLUSION

7    For the reasons set forth above, the Court DENIES B-Side's

8 motion to stay (Docket No. 107), GRANTS Counter-Plaintiffs' motion

9 for summary judgment (Docket No. 108) and DENIES B-Side's

10 cross-motion for summary judgment (Docket No. 112).

11    This Order resolves all remaining claims in this action,

12 except for those brought by B-Side against Counter-Defendant and

13 Cross-Defendant Vieko Horak.  Because Counter-Defendant and Cross-

14 Defendant Vieko Horak has filed for bankruptcy, the claims against

15 him are stayed pursuant to 11 U.S.C. § 362.  Finding no just

16 reason for delaying the other claims during the stay, the Court

17 directs the Clerk to enter partial judgment on the claims that do

18 not involve Horak, including the claims against B-Side and those

19 resolved in the Court's Order of March 20, 2012, the Union's

20 claims against ZEI and ZEI's claim against the Union.  Counter-

21 Plaintiffs shall recover their costs from ZEI and B-Side on a

22 joint and several basis.

23    Because the remaining claims are subject to an ongoing

24 automatic bankruptcy stay, there appears to be no further reason

25 to maintain the file as an open one at this time.  Accordingly,

26 the Clerk is directed to close the file.  Nothing contained in

27 this Order shall be considered a dismissal or disposition of the

28 claims against Horak.  Should further proceedings regarding those

claims become necessary or desirable, any party may initiate it in the same manner as if this Order had not been entered.

IT IS SO ORDERED.

Dated: 2/8/2013

_____
CLAUDIA WILKEN
United States District Judge